# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **ISMAEL ZARCO SANCHEZ,** ) | |
| **GABRIEL ARGUELLES,** ) | |
| **HECTOR AQUINO,** ) | |
| **GLORIA CASTANEDA,** ) | |
| **ORLIN WILIFREDO TURCIOS CASTRO,** ) | |
| **CARMEN DE LA CRUZ,** ) | |
| **ELIZABETH ESCOTO,** ) Civil Action No 4:24-cv-939 | |
| **REYNA GUIFFARO,** ) | |
| **MARCO ANTONIO LEMUS,** ) JURY TRIAL DEMANDED | |
| **DULCE OCHOA,** ) | |
| **GABRIEL OCHOA,** ) | |
| **JUAN PUAC,** ) | |
| **MARIA SARAVIA,** ) | |
| **LUIS SERRANO,** ) | |
| **JULIO TAFFINDER,** ) | |
| **CLAUDIA VELAZQUEZ, and** ) | |
| **ROBERTO ZAVALA,** ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS MARIA SARAVIA, ISMAEL ZARCO SANCHEZ, ORLIN WILIFREDO TURCIOS CASTRO, AND ROBERTO ZAVALA <u>AND BRIEF IN SUPPORT</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iv

INTRODUCTION ......................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ..................................... 2

ISSUES TO BE RULED UPON BY THE COURT ...................................... 2

LEGAL STANDARD ................................................................................... 3

STATEMENT OF UNDISPUTED FACTS .................................................. 4

    A.    CryptoFX was an investment scheme focused on the Latino community . 4

    B.    CryptoFX was a Ponzi scheme ...................................................... 4

    C.    CryptoFX regularly solicited new investors across its various offices ...... 5

    D.    Defendants all personally participated in the solicitation of investors ...... 6

        1.    Saravia solicited and facilitated new investments ........................... 6

        2.    Turcios organized and led classes that solicited investments from new investors ...................................................... 8

        3.    Sanchez coordinated the efforts of a team of Leaders and hosted multiple events to promote the CryptoFX scheme .............. 9

        4.    Zavala organized, promoted, and led meetings promoting the scheme to investors ............................................... 11

    E.    Beyond soliciting investors, Defendants also played key roles in administering the CryptoFX scheme and making Ponzi payments ......... 13

    F.    Defendants each received transaction-based compensation .................... 16

    G.    Defendants Sanchez, Zavala and Saravia knowingly made Ponzi payments and Sanchez misappropriated investor funds ........................... 17

H.      Defendants Sanchez and Zavala tried to conceal the scheme after
the Commission filed suit......................................................................... 18

ARGUMENT.................................................................................................. 20

I.      The SEC is entitled to summary judgment on its Securities Act Section 5
claims against Defendants ................................................................... 20

A.      The Venture Agreements are securities .................................... 21

B.      Defendants violated the registration provisions of Section 5.................. 22

1.      Defendants offered and sold securities ......................... 23

2.      No registration statement was in effect........................ 25

3.      Defendants used means of interstate communication
and transportation .......................................................... 25

4.      Defendants cannot prove an exemption from registration ........... 26

II.      The SEC is entitled to summary judgment on its Exchange Act
Section 15(a) claims against Defendants .................................................. 27

III.      The SEC is entitled to summary judgment on its Securities Act
Section 17(a)(2) and Exchange Act Rule 10b-5(b) claims against the
Fraud Defendants ................................................................................. 30

A.      The Fraud Defendants made misrepresentations and omissions
to investors in order to obtain money....................................... 31

B.      The Fraud Defendants' misrepresentations and omissions were
material................................................................................... 33

C.      The Fraud Defendants' statements were made in connection with the
offer/sale/purchase of a security in interstate commerce ......................... 34

D.      The Fraud Defendants acted with scienter ............................... 36

IV.    The SEC is entitled to summary judgment on its Securities Act Sections
       17(a)(1) and (3) and Exchange Act Rules 10b-5(a) and (c) claims against the
       Fraud Defendants...................................................................................................... 38

       A.     The Fraud Defendants participated in a fraudulent scheme and
              device in connection with the offer, purchase, and sale of
              Venture Agreements.................................................................................... 39

       B.     The Fraud Defendants acted with scienter ............................................... 41

       CONCLUSION ........................................................................................................ 42

# TABLE OF AUTHORITIES

**Cases**

*ABC Arbitrage Plaintiffs Group v. Tchuruk,*
291 F.3d 336 (5th Cir.2002) ................................................................. 33

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ........................................................................... 3

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................... 3

*Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.,*
916 F.3d 528 (5th Cir. 2019) ............................................................... 20

*Long v. Shultz Cattle Co.,*
881 F.2d 129 (5th Cir. 1989) ............................................................... 21

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ........................................................................... 3

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
547 U.S. 71 (2006) ............................................................................ 34

*Reves v. Ernst & Young,*
494 U.S. 56 (1990) ............................................................................ 20

*SEC v. Blackburn,*
No. CV 15-2451, 2015 WL 10911439 (E.D. La. Sept. 11, 2015) ............................... 22

*SEC v. Blackburn,*
No. CV 15-2451, 2020 WL 1166995 (E.D. La. Mar. 11, 2020) ................................. 34

*SEC v. Bowen,*
No. 3:22-CV-1415-S, 2024 WL 3462359 (N.D. Tex. July 17, 2024) .................. 28, 31

*SEC v. Carter,*
No. 4:19-CV-100-SDJ, 2020 WL 6304889 (E.D. Tex. Oct. 28, 2020) ............... 26, 35

*SEC v. Collyard,*
861 F.3d 760 (8th Cir. 2017) ............................................................... 27

*SEC v. Continental Tobacco Co. of S.C.,*
463 F.2d 137 (5th Cir. 1972) ....................................................... 20, 22, 26

*SEC v. Farmer*,
   No. 4:14-CV-2345, 2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ............................... 41

*SEC v. Farnsworth*,
   692 F. Supp. 3d 157 (S.D.N.Y. 2023) ....................................................... 36

*SEC v. Gann*,
   565 F. 3d 932 (5th Cir. 2009) ..................................................... 30

*SEC v. Hansen*,
   No. 83 Civ. 3692, 1984 WL 2413 (S.D.N.Y April 6, 1984) ....................................... 27

*SEC v. Helms*,
   No. A-13-CV-01036 ML, 2015 WL 5010298 (W.D. Tex. Aug. 21, 2015) .............. 28

*SEC v. Holschuh*,
   694 F.2d 130–44 (7th Cir. 1982) ..................................................... 41

*SEC v. Hopper*,
   No. Civ. H-04-1054, 2006 WL 778640 (S.D. Tex. Mar. 24, 2006) ........................... 30

*SEC v. Martino*,
   255 F. Supp. 2d 268 (S.D.N.Y. 2003) ....................................................... 28

*SEC v. Mauricio Chavez, et al.*,
   4:22-cv-3359 (S.D. Tex. filed Sept 19, 2022) ........................................... 1, 4

*SEC v. Milles*,
   No. 1:19-cv-714, 2022 WL 206808 (W.D. Tex. Jan 24, 2022)............................ 34, 41

*SEC v. Moss*,
   No. 4:20-CV-972-SDJ, 2022 WL 757226 (E.D. Tex. Mar. 11, 2022) ...................... 27

*SEC v. Narayan*,
   No. 3:16-CV-1417-M, 2017 WL 4652063 (N.D. Tex. Aug. 28, 2017) .................... 39

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ..................................................... 26

*SEC v. Provident Royalties, LLC*,
   No. 3:09-CV-01238-L, 2013 WL 5314354 (N.D. Tex. Sept. 23, 2013) .................... 36

*SEC v. Seghers*,
   298 F. App'x 319 (5th Cir. 2008) ....................................................... 33, 36

*SEC v. Shavers*,
   No. 4:13-CV-416, 2014 WL 4652121 (E.D. Tex. Sept. 18, 2014) ............................ 38

*SEC v. Silea*,
   No. 4:20-CV-737-SDJ, 2022 WL 269105
   (E.D. Tex. Jan. 27, 2022) ............................................................. 21, 26, 27, 33, 34, 37

*SEC v. Straub*,
   921 F. Supp. 2d 244 (S.D.N.Y. 2013) ........................................................ 26

*SEC v. Teshuater, LLC*,
   No. 4:20-CV-01187, 2024 WL 1348432 (S.D. Tex. Mar. 29, 2024) .................. 33, 34

*SEC v. Thomas*,
   No. 2:19-CV-01515, 2021 WL 5826279 (D. Nev. Aug. 24, 2021) .......................... 30

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) .......................................................................... 20, 21

*Swenson v. Engelstad*,
   626 F.2d 421 (5th Cir. 1980) .................................................................. 22

*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) .................................................................. 20

## Federal Statutes

### *Securities Act of 1933*

Section 2
   [15 U.S.C. § 77b] ............................................................................... 20

Section 5
   [15 U.S.C. § 77e] ...................................................................... 3, 20, 22, 26

Section 17
   [15 U.S.C. § 77q] ....................................................................... 3, 30, 33, 38

### *Securities Exchange Act of 1934*

Section 3
   15 U.S.C. § 78c ................................................................................ 20

Section 10
   [15 U.S.C. § 78j] ......................................................................... 3, 30, 38

Section 15
    [15 U.S.C. § 78o] .................................................................. 3, 27, 28, 30

Rule 10b-5(b)
    [17 C.F.R. § 240.10b-5(b)] ................................................. 3, 30, 36, 38

*Federal Rules of Civil Procedure*

    Fed. R. Civ. P. 56 ................................................................ 1, 3

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff U.S. Securities and Exchange Commission ("SEC") moves for summary judgment as to liability on all claims against Defendants Maria Saravia ("Saravia"), Orlin Wilifredo Turcios Castro ("Turcios"), Ismael Zarco Sanchez ("Sanchez"), and Roberto Zavala ("Zavala") (collectively, "Defendants"), and submits the following brief in support:

## **INTRODUCTION**

Defendants were high-level promoters of CryptoFX, LLC ("CryptoFX"), a cash Ponzi-scheme that purported to use investor funds to invest in crypto-asset and foreign-exchange ("forex") markets with the promise of consistent, above-market returns. CryptoFX and its founder, Mauricio Chavez, are currently defendants in a related matter, *SEC v. Mauricio Chavez et al.*, 4:22-cv-3359 (S.D. Tex. filed Sept. 19, 2022), in which the SEC alleged that CryptoFX was a Ponzi scheme that used new investor funds to pay investor returns and commissions to CryptoFX insiders. Chavez and his co-defendant, Giorgio Benvenuto, have consented to judgments on liability in that suit.

Defendants in this matter were referred to as "Leaders" within CryptoFX. As Leaders, Defendants all actively solicited new investors, assisted investors in executing investment contracts (known as "Venture Agreements"), coordinated the collection and disbursement of investor funds, and promoted the CryptoFX scheme through promotions and bonuses. In doing so, Defendants violated the federal securities laws by participating in unregistered offers and sale of securities and operating as unregistered brokers. Saravia, Sanchez, and Zavala (hereafter, the "Fraud Defendants") further violated the

antifraud provisions of the federal securities laws when they knowingly or with severe recklessness made various misrepresentations and omissions, misappropriated client funds, and/or played key roles in the perpetuation of the CryptoFX scheme.

## NATURE AND STAGE OF THE PROCEEDINGS

Of the 17 Defendants originally named in this suit, the SEC has settled with three (Julio Taffinder, Luis Serrano, and Marco Antonio Lemus). Eight of the remaining Defendants (Gloria Castaneda, Dulce Ochoa, Gabriel Ochoa, Gabriel Arguelles, Hector Aquino, Carmen de la Cruz, Juan Puac, and Claudio Velazquez) have not appeared in this action and are therefore in default. On June 12, 2025, the SEC filed a request for the Clerk to enter default as to these eight Defendants and will file a motion for default judgments thereafter. Six Defendants have appeared in this matter and four are addressed in this Motion. The remaining two Defendants (Elizabeth Escoto and Reyna Guiffaro) have, within the last few days, executed consents agreeing to the entry of bifurcated judgments against them resolving all issues of liability. The SEC intends to present these consents and accompanying judgments to the Court shortly.

## ISSUES TO BE RULED UPON BY THE COURT

With discovery nearing completion and no genuine dispute existing, the SEC hereby moves for summary judgment as to issues of liability on all of its claims against Defendants.[1] The Court must therefore resolve whether Defendants violated:

---

[1] The SEC is moving for summary judgment only as to liability on all of its claims. If the Court grants this motion, the SEC intends to file a motion for remedies addressing the relief sought and for entry of judgments.

(1) Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)]; and

(2) Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)].

The Court must also resolve whether the Fraud Defendants violated:

(3) Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and

(4) Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## LEGAL STANDARD

The Court should grant summary judgment if the pleadings and other documents show there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The trial judge should enter summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted); *see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"). While the Court must view the facts in the light most favorable to the non-moving party, that party must come forward with "specific facts showing there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587.

## STATEMENT OF UNDISPUTED FACTS

**A. CryptoFX was an investment scheme focused on the Latino community.**

Founded in February 2020, CryptoFX was a Texas limited liability company that billed itself as crypto-asset and foreign exchange ("forex") trading academy, but was, in fact, an investment scheme. Ex. 5, Lewis Decl. ¶ 4.a [APP. 232]. Investors executed Venture Agreements with CryptoFX that promised returns ranging from 15% to 100%. Ex. 1, Zavala Depo. 97:22-98:1 [APP. 54-55]; Ex. 2, Saravia 3/12/25 Depo. 56:17-57:25 [APP. 103-104]; Ex. 3, Presentation, at CFX_020277 [APP. 140]. CryptoFX's representatives claimed that its founder, Mauricio Chavez, and a team of traders would use invested funds to trade in crypto-asset and forex markets. Ex. 2, Saravia 3/12/25 Depo. 55:23-56:5 [APP. 102-103]; Ex. 4, Turcios Depo. 30:21-31:9 [APP. 185-186]. Approximately 40,000 investors—primarily from the Latino community—across multiple states and foreign countries invested in CryptoFX over the course of two and a half years. Ex. 5, Lewis Decl. ¶ 4.b [APP. 232].

**B. CryptoFX was a Ponzi scheme.**

On September 19, 2022, the SEC filed an emergency action in the United States District Court for the Southern District of Texas to halt CryptoFX's ongoing fraudulent offering. The Court granted a temporary restraining order (and later a preliminary injunction), an asset freeze, and appointed a receiver over CryptoFX and the assets of Chavez and Benvenuto. Orders [dkt. 7, 10 & 11], *SEC v. Mauricio Chavez, et al.*, 4:22-cv-3359 (S.D. Tex. Sept. 29, 2022).

Following his appointment, the Receiver conducted an investigation of CryptoFX's operations and accounting. Ex. 5, Lewis Decl. ¶¶ 4-4.a [APP. 231-232]. He has determined that CryptoFX operated as a large Ponzi scheme. *Id.* ¶ 4.c [APP. 232]. The Receiver's accountants have reviewed CryptoFX's books and determined that CryptoFX took in over approximately $448 million in investments. *Id.* CryptoFX then paid out approximately $431 million in payments to investors predominately using other investor funds. *Id.* ¶¶ 4-4.d [APP. 231-232]. Based on CryptoFX's accounting records, the Receiver similarly determined that CryptoFX generated minimal, if any, returns through crypto-asset or forex trading and did not use investor funds to trade in any significant degree. *Id.*

## C.     CryptoFX regularly solicited new investors across its various offices.

CryptoFX had offices in multiple cities across the country. Ex. 6, Munoz Depo. 73:2-16 [APP. 247]; Ex. 7, Presentation, at SEC-ReceiverLJ-E-0002311 [APP. 299]. Each office held regular presentations, both in person and via Zoom, for investors regarding CryptoFX and its investment packages. Ex. 8, Sanchez Depo. 145:3-146:14 [APP. 404-405]; Ex. 4, Turcios Depo. 38:11-39:3, 47:7-48:16 [APP. 187-188, 193-194]; Ex. 1, Zavala Depo. 70:17-71:1 [APP. 32-33]. Though the presentations differed between offices,[2] the investment pitch included substantially the same main points:

- A Leader from CryptoFX—including Turcios and Zavala—provided an overview of CryptoFX. Ex. 4, Turcios Depo. 53:25-56:8 [APP. 197-200]; Ex. 1, Zavala Depo. 21:4-12, 38:4-39:6 [APP. 10, 22-23].

---

[2] Ex. 2, Saravia 3/12/25 Depo. 54:7-14 [APP. 101] (confirming that the presentations did not change substantially during the course of the scheme); Ex. 8, Sanchez Depo. 45:4-46:6, 145:3-146:14 [APP. 346-347, 404-405] (same).

- The Leader explained that a new investor could invest in one of three packages. Ex. 3, Presentation, at CFX_020275 [APP. 138]; Ex. 2, Saravia 3/12/25 Depo. 42:15-21 [APP. 93].

- Investors were promised returns that purportedly came through the trading of CryptoFX traders. Ex. 8, Sanchez Depo. 35:15-36:10 [APP. 340-341]; Ex. 12, Trans., at 1-2 [APP. 531-532]; Ex. 1, Zavala Depo. 24:12-17 [APP. 11].

- The Venture Agreements' investment term was six months, but investors were encouraged to "roll over" their contracts and keep their money in the company. Ex. 12, Trans., at 2-3 [APP. 532-533].

- Investors were encouraged to invest with cash, though they could also invest with bitcoin or by check. Ex. 8, Sanchez Depo. 102:13-19 [APP. 378]; Ex. 19, Portillo Decl. ¶ 6 [APP. 611]; Ex. 20, Llangari Decl. ¶ 7 [APP. 615].

- Investors were also told they could earn commissions if they got others to invest. Ex. 4, Turcios Depo. 57:14-21 [APP. 201]; Ex. 8, Sanchez Depo. 45:4-6 [APP. 346]; Ex. 3, Presentation, at CFX_020276 [APP. 139]. CryptoFX operated as a multi-level marketing scheme: investors received 7% of any amount invested by someone they personally invited, and 3% of the amount invested by someone their invitees invited. Ex. 2, Saravia 3/12/25 Depo. 41:4-42:2 [APP. 92-93]; Ex. 1, Zavala Depo. 27:19-28:17 [APP. 14-15]. Those who invited new investors and received 7% commissions were referred to as "direct sponsors" and those who received 3% commissions were "indirect sponsors." Ex. 2, Saravia Depo. 41:4-22 [APP. 41].

**D.** **Defendants all personally participated in the solicitation of investors.**

Defendants worked in offices located in Chicago and Houston. Ex. 7, Presentation, at SEC-ReceiverLJ-E-0002314, 2316 [APP. 302, 304]. As Leaders, Defendants each played a unique role in the solicitation of investors. *Id.*; Ex. 4, Turcios Depo. 40:5-21 [APP. 189]; Ex. 1, Zavala Depo. 27:10-16 [APP. 14].

**1. Saravia solicited and facilitated new investments.**

Beginning around the end of 2020, Saravia worked in the Houston headquarters of CryptoFX. Ex. 2, Saravia 3/12/25 Depo. 18:23-19:5, 22:9-12 [APP. 78-80]. She helped people fill out contracts, explained contract terms, collected money from new investors,

paid out investment returns, and signed contracts on behalf of CryptoFX. *Id.* at 33:18-34:23, 35:10-24, 45:1-20, 58:13-59:1, 113:8-24 [APP. 85-87, 94, 105-106, 129]. As part of her solicitation efforts, she also shared her own experiences with new investors and repeated statements that investor money would be invested in crypto-assets. *Id.* at 24:9-25:14, 36:2-39:17, 45:1-20 [APP. 81-82, 88-91, 94]. She assured at least one investor that CryptoFX was "legitimate" and not a scheme; told him he would not lose his money, even in a panic; told him he would earn returns on his investment; and insisted that it was a good opportunity. Ex. 19, Portillo Decl. ¶ 5 [APP. 611].

Saravia personally solicited at least ten to twelve people to join CryptoFX. Ex. 2, Saravia 3/12/25 Depo. 46:15-47:20, 52:24-53:3, 54:1-55:4 [APP. 95-96, 99-102]; Ex. 42, Contracts [APP. 1746-1750] (containing, in part, contracts for those invited by Saravia). Saravia also administered a group chat in which she notified investors of her working hours and circulated promotions to encourage existing investors to bring in new investors. *Id.* at 104:18-105:15, 105:21-25 [APP. 127-128]; Ex. 21, Group Chat, at CFX_016597 - 16598, 16601, 16628 [APP. 706-707, 710, 737].[3] Saravia also directly solicited new investments through the chat. For example:[4]

```
[4/30/21, 10:53:57 AM] Lolys: MI NOMBRE ES MARIA LOLY SARAVIA Y SOY LA ENCARGADA DE
ESTE GRUPO ESTOY A SUS ÓRDENES SI NECESITAN UNA PRESENTACIÓN O SI NECESITAN QUE LES
AYUDE PARA HACER UN CONTRATO

O SI QUIEREN HACER UNA CITA PARA COBRAR SUS COMISIONES

O PAGO DE CONTRATO CON GUSTO YO LES PUEDO AYUDAR CON ESO
```

*Ex. 21, Group Chat, at CFX_016628 [APP. 737]*

---

[3] Ex. 22, Saravia Disc. Resp. [APP. 816-817] (authenticating Ex. 21).

[4] Trans.: "My name is Maria Loly Saravia and I am in charge of this group. I am at your service if you need an introduction or if you need me to help you make a contract or if you want to make an appointment to collect your commission or contract payment, I can gladly help you with that."

### 2. Turcios organized and led classes that solicited investments from new investors.

Turcios began working for CryptoFX around March 2022. Ex. 4, Turcios Depo. 27:19-28:3 [APP. 183-184]. He gave presentations to potential and existing investors at least once a week at an office in North Houston and, occasionally, in Louisiana. *Id.* at 47:7-48:9, 53:8-24, 56:16-58:4, 86:13-24, 96:18-97:2 [APP. 193-194, 197, 200-202, 205, 212-213]. During these meetings, Turcios provided information about investing in CryptoFX. *See* Ex. 10, Video [APP. 529]; Ex. 12, Trans. [APP. 531-534]; Ex. 4, Turcios Depo. 56:16-58:4, 67:24-68:9 [APP. 200-204] (confirming that the presentation captured in Exs. 10 & 13 was a typical presentation he gave). He told investors that CryptoFX invested investor funds in crypto-assets, that investors would get a return of 15% every month, that they could be paid every three months, and that they could earn commissions. Ex. 4, Turcios Depo. 56:16-58:4 [APP. 200-202]; Ex. 12, Trans., at 1-2 [APP. 531-532]. He compared the investment to the "goose that laid the golden egg" and encouraged investors to keep their money invested in CryptoFX. Ex. 12, Trans., at 2-3 [APP. 532-533]. To bolster his pitch, he touted his own success and returns, and he called on other investors to do the same. Ex. 4, Turcios Depo. 53:25-56:8, 56:16-58:4 [APP. 197-202]. Turcios knew people were recording his presentations to be shared online and he did not object. *Id.* at 52:12-53:7 [APP. 196-197]. Videos of his presentations were shared on social media. Ex. 10, Video [APP. 529]; Ex. 12, Trans. [APP. 531-534]; Ex. 13, Video [APP. 535]; Ex. 15, Trans. [APP. 538-546]. Turcios admits to personally inviting multiple investors to join CryptoFX. Ex. 4, Turcios Depo. 99:8-15, 100:20-23 [APP.

214-215]; Ex. 41, Contracts [APP. 1733-1745] (containing, in part, some of the contracts for those invited by Turcios).

Turcios also operated a group chat in which he posted flyers and announced the time and location of his presentations. Ex. 4, Turcios Depo. 87:23-89:6, 90:14-20 [APP. 206-209].



*Ex. 23, Flyer [APP. 819]*

### 3. Sanchez coordinated the efforts of a team of Leaders and hosted multiple events to promote the CryptoFX scheme.

Beginning in 2020, Sanchez helped set up monthly meetings in Chicago at which Chavez presented about CryptoFX. Ex. 8, Sanchez Depo. 26:19-27:14, 36:14-37:8, 45:4-46:4 [APP. 333-334, 341-342, 346-347]. Sanchez found meeting spaces for at least the first two meetings and invited his friends to attend. *Id.* at 33:2-21, 34:4-14, 89:12-23, 90:20-25 [APP. 338-339, 375-376] (stating he invited investors from Illinois and Michigan). Some of these early meetings were done via Zoom, with nearly thirty attendees. *Id.* at 62:12-23, 63:1-9 [APP. 358-359].

Sanchez later became the head of an office in Chicago, which was referred to as "Team Ismael." *Id.* at 52:23-53:14 [APP. 352-353]. There were hundreds of people on Team Ismael. *Id.* at 123:4-16 [APP. 396]. Sanchez's duties included resolving issues with customer investment data, overseeing the accounting for new contracts and payments to investors, presenting weekly classes on crypto-assets, and opening and closing the office. *Id.* at 39:15-40:5, 103:8-14, 104:5-19, 112:9-113:12, 121:14-122:4 [APP. 343-344, 379-380, 386-387, 394-395]. He also promoted and taught regular classes about crypto-assets, despite knowing investors would simply invest in CryptoFX rather than in crypto-assets. Ex. 24, Group Chat, at CFX_019004 [APP. 873]; Ex. 1, Sanchez Depo. 39:15-40:5, 44:11-18, 45:4-6 [APP. 343-346].

Sanchez also hosted a group chat for Team Ismael and posted in other group chats. *Id.* at 131:21-132:25, 139:11-14 [APP. 397-398, 401]; Ex. 24, Group Chat [APP. 820]. He would post links to Zoom meetings and promotions to encourage team members to bring in more investors. Ex. 8, Sanchez Depo. 144:24-146:7 [APP. 403-405]; Ex. 24, Group Chat, at CFX_018961 [APP. 830]; *see also* Ex. 44, Group Chat, at CFX_017311 [APP. 2049]. He also attended meetings and answered questions about his returns and experience with CryptoFX. Ex. 8, Sanchez Depo. 49:5-50:2 [APP. 350-351]; Ex. 20, Llangari Decl. ¶ 3 [APP. 614].

In August 2022, Sanchez hosted an event in Houston that encouraged the attendees to bring in new investors. Ex. 18, Trans. [APP. 549-609]; Ex. 16, Video [APP. 547]; Ex. 8, Sanchez Depo. 55:20-22, 56:15-20, 57:2-7 [APP. 354-356]. A video of this

event was later posted on Youtube.  Ex. 16, Video [APP. 547].[5]  Sanchez led the meeting, during which he invited numerous leaders to stand and speak about their commissions and bonuses.  Ex. 18, Trans., at 29-45 [APP. 577-593].  Claiming that the business had already made multiple millionaires, he told the attendees that they could retire at 40 and that they were no different than other leaders who earned five-to-six figure bonuses.  *Id.* at 3, 35, 40 [APP. 551, 583, 588].  Sanchez claimed to be a crypto expert and said that he had personally made $11 million in 2018, an assertion which he now admits was false. *Id.* at 21 [APP. 569]; Ex. 8, Sanchez Depo. 64:18-66:9 [APP. 360-362].

In October 2022—*after* the SEC had sued CryptoFX and obtained a restraining order—Sanchez hosted another event in Chicago to celebrate his office's two-year anniversary.  Ex. 8, Sanchez Depo. 76:8-77:25, 78:10-79:18, 80:20-23 [APP. 370-374]. This meeting was similar in content to the Houston meeting.  *Id.*  Investors executed investment contracts at both the Houston and Chicago meetings.  *Id.* at 78:10-23 [APP. 372]; Ex. 25, Velez Decl. ¶ 5 [APP. 1337].

### 4.  Zavala organized, promoted, and led meetings promoting the scheme to investors.

Zavala took part in a series of presentations throughout 2021 and 2022 to groups of potential and existing investors in Chicago, Miami, Atlanta, Los Angeles, and Houston.  Ex. 1, Zavala Depo. 26:4-27:9, 36:5-39:6 [APP. 13-14, 20-23].  The meetings all focused on investing in CryptoFX.  *Id.* at 38:23-39:2 [APP. 22-23]; *see* Ex. 3,

---

[5] Ex. 17, Castillo Decl. [APP. 548] (authenticating Ex. 16).

Presentation [APP. 131-146] (presentation used during meetings).[6]  Some of these

meetings included hundreds of investors, though Zavala also met with investors one-on-

one.  Ex. 1, Zavala Depo. 34:2-11, 36:5-39:6 [APP. 19-23].  Whether it was in meetings

or one-one-one conversations, however, Zavala's message remained the same: he told

investors that CryptoFX would invest in crypto-assets or forex using investor funds, that

investors could passively earn returns up to 15%, and that investors would get

commissions from bringing in new investors.  *Id.* at 24:9-25:14, 34:2-11, 36:5-39:6 [APP.

11-12, 19-23]; *see also* Ex. 3, Presentation, at CFX_020268 - CFX_020283 [APP. 131-

146].  Zavala told at least one investor that CryptoFX would double his money in a year

and that the investment was safe and secure.  Ex. 45, Puga Decl. ¶ 4 [APP. 2060].

In addition to giving presentations, Zavala oversaw a team of hundreds of

investors.  Ex. 1, Zavala Depo. 28:14-29:1 [APP. 15-16].  He personally invited at least

10 people to join CryptoFX, and many more were invited by those he invited.  *Id.*; Ex.

43, Contracts [APP. 1751-1948] (containing some contracts of those invited by Zavala).

He operated an office in Chicago, regularly met with investors, assisted them in

executing contracts, and answered their questions.  Ex. 1, Zavala Depo. 26:4-17, 29:2-4,

95:21-96:3 [APP. 13, 16, 52-53].  Zavala also participated in a group chat in which he

posted links to promotional CryptoFX meetings and encouraged investors to bring friends

and family.  *Id.* at 70:17-71:1 [APP. 32-33]; Ex. 9, Group Chat, at SEC-ReceiverLJ-E-

---

[6] Ex. 1, Zavala Depo. 44:6-11, 45:12-46:1, 53:7-13 [APP. 26-29] (authenticating Ex. 3).

0002756 [APP. 433].[7]  Some of Zavala's own presentations were advertised via flyers in the group chat.  Ex. 1, Zavala Depo. 40:2-41:5 [APP. 24-25]; Ex. 26, Flyer [APP. 1342].

E.  **Beyond soliciting investors, Defendants also played key roles in administering the CryptoFX scheme and making Ponzi payments.**

Saravia collected investor funds and stored them in a safe, to which she had exclusive access, on the ground floor of the CryptoFX headquarters in Houston.  Ex. 2, Saravia 3/12/25 Depo. 60:19-62:2 [APP. 107-109].  She then deposited the funds at CryptoFX's accounting office and paid out returns to investors at the accounting office's direction.  *Id.* at 113:8-24 [APP. 129].

After his presentations, Turcios helped investors fill out contracts and answered their questions regarding the investment.  Ex. 4, Turcios Depo. 48:10-16, 94:18-95:9, 95:17-96:3 [APP. 194, 210-212].  He collected investor funds, stored them in a safe, and transported them and the new investor contracts weekly to CryptoFX's headquarters in Houston.  *Id.* at 94:18-95:9, 121:7-14, 122:5-123:1 [APP. 210-211, 223-225].  A few investors also sent Turcios investment funds by wire.  *Id.* at 124:12-15 [APP. 226].

Sanchez, who worked in Chicago, communicated via phone and text with the accounting office in Houston.  Ex. 8, Sanchez Depo. 121:14-122:4 [APP. 394-395]; Ex. 6, Munoz Depo. 65:5-67:6, 150:3-4 [APP. 244-246, 285].  If issues with payments or contracts arose, he handled them for the accounting office.  Ex. 8, Sanchez Depo. 112:9-113:12, 121:14-122:4 [APP. 386-387, 394-395].  He also coordinated the transfer of

---

[7] Ex. 1, Zavala Depo. 61:18-63:21, 74:11-16 [APP. 31.1-31.3, 33.1] (authenticating group chat).

investor cash from Chicago to Houston on a weekly basis. *Id.* at 103:8-14, 104:5-19 [APP. 379-380].

Zavala likewise communicated with CryptoFX's Houston office via text to report on new investor inflows and outgoing payments. Ex. 28, Chat [APP. 1344-1352]; Ex. 30, Chat[8] [APP. 1354-1381]; Ex. 1, Zavala Depo. 30:19-31:22 [APP. 17-18]. Zavala also received investor cash, arranged for its transport to Houston headquarters, and paid out purported investor returns and commissions. Ex. 1, Zavala Depo. 80:19-24, 87:13-89:4, 93:6-94:4 [APP. 37, 44-46, 50-51]. Though the vast majority of investments were in cash, Zavala and Sanchez also told investors that they could invest via Bitcoin or wire. Ex. 49, Text [APP. 2065]; Ex. 8, Sanchez Depo. 105:19-106:25 [APP. 381-382]; Ex. 1, Zavala Depo. 102:5-11 [APP. 59]; Ex. 4, Turcios Depo. 124:12-15 [APP. 226].

Beginning in late 2021 or early 2022, Zavala, Sanchez, and Saravia maintained separate online spreadsheets to track new investors and outgoing payments. Ex. 31, Saravia Spreadsheet [APP. 1392]; Ex. 32, Sanchez Spreadsheet [APP. 1386-1667]; Ex. 33, Zavala Spreadsheet [APP. 1668].[9] Defendants all relied on these spreadsheets to notify CryptoFX's accounting office of new investments and payments made, to coordinate and track approvals for payments, and to confirm that the money CryptoFX received from each Leader matched the amounts collected from investors. Ex. 2, Saravia 3/12/25 Depo. 98:20-99:7 [APP. 122-123]; Ex. 8, Sanchez Depo. 111:4-17 [APP. 385];

---

[8] Ex. 1, Zavala Depo. 59:12-15, 59:18-60:23, 75:11-77:1 [APP. 30-31, 34-36] (authenticating group chats in Exs. 28 and 30).
[9] Ex. 2, Saravia 3/12/25 Depo. 65:13-66:12, 67:12-15, 92:16-18 [APP. 110-112, 121] (authenticating Ex. 31); Ex. 8, Sanchez Depo. 109:19-110:24 [APP. 383-384] (authenticating Ex. 32); Ex. 1, Zavala Depo. 80:10-24, 81:8-18 [APP. 37-38] (authenticating Ex. 33).

Ex. 1, Zavala Depo. 80:19-24, 81:13-82:2, 84:11-87:12 [APP. 37-39, 41-44]; *see also* Ex. 6, Munoz Depo. 98:22-100:4, 117:8-118:6 [APP. 248-250, 253-254].

The spreadsheets were uniform in appearance and operation and were maintained by Defendants or with Defendants' oversight.  Ex. 6, Munoz Depo. 151:4-152:10 [APP. 286-287].  The spreadsheets had monthly tabs, and each tab contained sections listing new investor contracts, payments of returns to investors, rollovers, and commissions paid to investors.  Ex. 31, Saravia Spreadsheet [APP. 1382]; Ex. 32, Sanchez Spreadsheet [APP. 1383-1667]; Ex. 33, Zavala Spreadsheet [APP. 1668]; *see also* Ex. 6, Munoz Depo. 115:12-116:6, 116:24-148:10 [APP. 251-284] (explaining the different sections and entries within the spreadsheets).  The spreadsheets also had monthly "Leader Balance Summaries," which showed that money from new investors was used to pay existing investors' commissions, returns, and other expenses.  Ex. 31, Saravia Spreadsheet [APP. 1382]; Ex. 32, Sanchez Spreadsheet [APP. 1383-1667]; Ex. 33, Zavala Spreadsheet [APP. 1668]; *see also* Ex. 6, Munoz Depo. 143:25-146:18 [APP. 279-282]; Ex. 8, Sanchez Depo. 114:25-118:17 [APP. 388-392]; Ex. 2, Saravia 3/12/25 Depo. 81:25-82:20, 85:10-86:16 [APP. 113-116].  The balance after those payments was "owed" to CryptoFX, meaning it was sent to headquarters. Ex. 1, Zavala Depo. 87:1-18 [APP. 44].

| LEADERS SUMMARRY BALANCES | | | |
|---|---|---|---|
| STARTING BALANCE FROM PREVIOUS | | $584,839 | |
| UPGRADES | | $4,300 | |
| NEW CASH CONTRACTS | | $10,617,000 | |
| NEW BTC CONTRACTS | | $154,500 | |
| NEW CHECK COTRACTS | | $8,276,881 | |
| TOTAL CASH RECEIVED BALANCE | | $11,206,139 | |
| | | | |
| PAYMENTS APENDING APROVAL | | $0 | |
| CONTRACTS PAID APPROVED | | $3,845,864 | |
| COMISIONS PAID APPROVED | | $1,873,270 | $1,881,705.00 |
| BONO ELITE APPROVED | | $384,500 | |
| EXPENSES MADE BY LEADER | | | |
| | | | |
| PAGOS PENDIENTES APROBAR | | | |
| TOTAL PAYMENTS MADE WITH CASH | | $6,103,634 | |
| CASH CONTRACTS PAID IN CHECKS | | $310,000 | |
| LEADER CASH 8/4/22 | | $31,260 | ISABEL |
| ENVIADO A OFICINA HOUSTON | | $1,275,000 | |
| MANDO CON CHINO 8/28 | | $2,730,000 | |
| BALANCE LEADER OWE | | $756,245 | |

*Ex. 32, Sanchez Spreadsheet, at Sanchez 000001 [APP. 1383]*

## F. Defendants each received transaction-based compensation.

Defendants each admit that they received commissions based on the amounts invested by those whom they directly invited to invest in CryptoFX. Ex. 8, Sanchez Depo. 101:9-102:1 [APP. 377-378]; Ex. 4, Turcios Depo. 103:11-104:8, 106:19-108:6, 111:4-112:21 [APP. 216-222]; Ex. 2, Saravia 3/12/25 Depo. 46:15-47:20, 100:18-101:4, 102:3-12 [95-96, 124-126]; Ex. 1, Zavala Depo. 101:16-102:1 [APP. 58-59]. They each also received commissions when their invitees invited someone else. Ex. 8, Sanchez Depo. 101:9-102:1 [APP. 377-378]; Ex. 4, Turcios Depo. 106:19-108:6, 111:4-112:21 [APP. 218-222]; Ex. 2, Saravia 3/12/25 Depo. 46:15-47:20, 100:18-101:4, 102:3-12 [APP. 95-96, 124-126]; Ex. 1, Zavala Depo. 101:16-102:1 [APP. 58-59]. Sanchez also brokered a deal with Chavez, pursuant to which Sanchez received a commission based on the volume of contracts generated by Team Ismael. Ex. 8, Sanchez Depo. 66:20-67:24 [APP. 362-363].

### G. Defendants Sanchez, Zavala, and Saravia knowingly made Ponzi payments and Sanchez misappropriated investor funds.

Sanchez, Zavala, and Saravia all admit they used funds from new CryptoFX investors to pay existing investors' returns and commissions rather than to trade in crypto-assets or forex as represented. Ex. 51, Saravia 12/15/22 Depo. 140:1-14 [APP. 2075]; Ex. 8, Sanchez Depo. 103:2-104:5, 114:25-118:17 [APP. 379-380, 388-392]; Ex. 1, Zavala Depo. 86:10-25 [APP. 43]. At the same time, they rarely asked Chavez or other CryptoFX insiders about CryptoFX's returns, and none ever endeavored to determine whether CryptoFX was making enough to cover the payments they were making. Ex. 1, Zavala Depo. 90:2-19, 91:13-92:10 [APP. 47-49]; Ex. 2, Saravia 3/12/25 Depo. 31:3-17, 32:2-11 [APP. 83-84]; Ex. 8, Sanchez Depo. 28:1-30:25 [APP. 335-337]. In fact, when Sanchez asked CryptoFX to send money to cover investor return payments, he was told to simply bring in more investors to cover the deficit. Ex. 8, Sanchez Depo. 118:18-119:6, 135:22-136:12 [APP. 392-393, 399-400]. Regardless, Sanchez continued to sign up new investors. Ex. 32, Sanchez Spreadsheet, at SANCHEZ 000245 – 253 [APP. 1627 -1635] (showing new contracts entered in September/October 2022).

Sanchez also misappropriated funds for his personal expenses. On at least one occasion, an investor was directed to send his investment funds to an account controlled by Sanchez. Ex. 20, Llangari Decl. ¶ 7 [APP. 615]. The wiring receipt that the investor received confirms that the money was sent to Chicago Title of Texas, and the related memorandum indicates it was to purchase real property at "Crysti Court." *Id.* ¶ 11 & Att. SEC-LlangariMJ-E-0000001-2 [APP. 616, 618-619]. This was a property that Sanchez

purchased in May 2022. Ex. 34, General Warranty Deed, at CTofTxLLC1492 – 1496 [APP. 1669-1673].[10] Records obtained from Chicago Title of Texas confirm that Sanchez used the wired investor funds to purchase that property. Ex. 36, Ledger, at CTofTxLLC0213 [APP. 1680] (single ledger balance of property purchase showing transfer made by Llangari); Ex. 37, Wire Notice, at CTofTxLLC1498 [APP. 1686] (showing incoming wire to Chicago Title from Llangari).

### H. Defendants Sanchez and Zavala tried to conceal the scheme after the Commission filed suit.

After the SEC filed its lawsuit against CryptoFX on September 19, 2022, the Court froze the accounts of CryptoFX. Ex. 5, Lewis Decl. ¶ 2 [APP. 231]. Undeterred, Sanchez and Zavala continued to take in new investor funds and execute contracts. Ex. 32, Sanchez Spreadsheet, at SANCHEZ 000245 – 253 [APP. 1627 -1635] (showing new contracts executed in September/October 2022); Ex. 33, Zavala Spreadsheet [APP. 1668] (same). Sanchez's team continued to circulate promotions regarding bonuses for those who brought in new investors. Ex. 25, Velez Decl. Att. at SEC-VelezJ-E-0000020 [APP. 1340].

In a meeting with Team Ismael, Sanchez avoided the topic of the SEC's lawsuit or told investors not to worry about it. Ex. 25, Velez Decl. ¶ 5 [APP. 1337]. He assured investors they would be paid and encouraged new investors to invest in CryptoFX during and after the event. *Id.* ¶¶ 5-7 [APP. 1337-1338]. Near the end of October 2022, Sanchez's "Team Ismael" issued a message that directed investors to create digital

---

[10] *See* Ex. 35, Dupre Decl. [App. 1676] (authenticating Exs. 34, 36, 37, and 50).

wallets in order to get their returns.  Ex. 38, Post [APP. 1688]; Ex. 8, Sanchez Depo. 163:13-164:15 [APP. 406-407].  Sanchez helped investors set up digital wallets, but in hindsight acknowledges that this was an effort by CryptoFX to buy time.  Ex. 8, Sanchez Depo. 163:13-164:15, 164:25-165:19 [APP. 406-408].  Sanchez never sent a message to Team Ismael apprising them of the SEC's lawsuit and allegations against CryptoFX.  *Id.* at 167:5-16, 168:2-5 [APP. 409-410].

Around October or November 2022, Zavala hosted a call with CryptoFX investors via Zoom.  Ex. 39, Recording [APP. 1689]; Ex. 40, Trans. [APP. 1690-1732].[11]  In that call, he acknowledged that CryptoFX's assets had been frozen.  Ex. 40, Trans., at 25 [APP. 1709].  Even so, he encouraged investors to create digital wallets for repayments. *Id.* at 15 [APP. 1704].  He also promoted a "solution" in the form of a purported new investment, 24/7 Academy.  *Id.* at 1-4 [APP. 1690-1693].  Though he pitched 24/7 Academy as a new organization created by Chavez, it was the same scheme as CryptoFX. *Id.* at 1- 9 [APP. 1690-1698].  Zavala specifically stated that

- investors could invest in three different packages for $1,000, $5,000 or $10,000;
- investors would earn passive returns up to 12%;
- returns would be achieved through Chavez's forex trading; and
- investors could earn commissions of 7% on all referrals.

---

[11] Ex. 1, Zavala Depo. 113:2-17 [APP. 60] (authenticating Ex. 39)

*Id.* at 1-2, 4-6, 9 [APP. 1690-1691, 1693-1695, 1698]. The sole difference between CryptoFX and 24/7 Academy was that 24/7 Academy would have no contracts and would not compile investor information. *Id.* at 6 [APP. 1695].

Sanchez also solicited new investors to 24/7 Academy. Ex. 25, Velez Decl. ¶ 8 [APP. 1338]. He told investors that they had to invest in 24/7 Academy because it would increase their chances of being repaid by CryptoFX. *Id*.

## ARGUMENT

I. **The SEC is entitled to summary judgment on its Securities Act Section 5 claims against Defendants.**

Sections 5(a) and (c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce unless an exemption from registration applies. *SEC v. Continental Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972). Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define the term security to include an "investment contract." 15 U.S.C. § 77b(a)(l); 15 U.S.C. § 78c(a)(10). An "investment contract" qualifies as a security if the contract meets three requirements: "(i) an investment of money; (ii) in a common enterprise; and (iii) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946); *Williamson v. Tucker*, 645 F.2d 404, 417-418 (5th Cir. 1981). Courts making a determination under *Howey* must disregard "legal formalisms" and instead focus on "the economics of the transaction." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). In the Fifth Circuit, courts apply the "broad vertical commonality test" to determine if a common enterprise exists. *Living Bens.*

*Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.*, 916 F.3d 528, 536 (5th Cir. 2019) (quoting

*Long v. Shultz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989)).  Under this test, "the

necessary interdependence may be demonstrated by the investors' collective reliance on

the promoter's expertise." *Shultz Cattle*, 881 F.2d at 141.

### A. The Venture Agreements are securities.

Here, each of the *Howey* requirements is met: (1) Defendants cannot reasonably

dispute that investors invested money into CryptoFX in exchange for the Venture

Agreements. *See, e.g.*, Ex. 1, Zavala Depo. 24:9-25:14 [APP. 11-12].  The evidence also

conclusively establishes (2) a "common enterprise" because investors pooled their funds

and collectively relied upon the purported efforts and expertise of Chavez to trade on

their behalf.  Ex. 2, Saravia 3/12/25 Depo. 55:23-56:16 [APP. 102-103]; Ex. 4, Turcios

Depo. 30:21-31:9 [APP. 185-186]; Ex. 1, Zavala Depo. 36:5-39:6 [APP. 20-23].  Finally,

investors had reasonable (3) "expectations of profits solely through the efforts of others"

because the investment was passive and investors expected to receive a return—typically

in the range of 15% monthly or quarterly—solely through the purported crypto-asset and

forex trading of CryptoFX.  Ex. 3, Presentation, at CFX_020274, CFX_020277 [APP.

137, 140]; Ex. 1, Zavala Depo. 24:9-25:14, 38:14-17 [APP. 11-12, 22]; Ex. 4, Turcios

Depo. 21:15-27:13, 30:21-31:9 [APP. 177-183, 185-186].  The investments, as reflected

in the Venture Agreements, were therefore securities and their offer and sales were

required to be registered under the Securities Act. *See SEC v. Silea*, No. 4:20-CV-737-

SDJ, 2022 WL 269105, at *9 (E.D. Tex. Jan. 27, 2022) (finding that sales of membership

interests in purported fund that would use the investors' money to trade constituted sales of securities).

**B.** **Defendants violated the registration provisions of Section 5.**

To establish a *prima facie* violation of Sections 5(a) and (c), the Commission need only prove: (1) defendants, directly or indirectly, offered or sold securities; (2) no registration statement was in effect as to the securities; and (3) interstate transportation or communication, or the mails, were used in connection with the offer or sale. *See* 15 U.S.C. §§ 77e(a) and (c); *Cont'l Tobacco,* 463 F.2d at 155. Once a *prima facie* violation is established, the burden then shifts to the defendants to prove that the securities offering qualified for an exemption. *Cont'l Tobacco,* 463 F.2d at 156. Because Section 5 is a strict liability statute, a defendant's intent is irrelevant. *Swenson v. Engelstad,* 626 F.2d 421, 424 (5th Cir. 1980).

Because Sections 5(a) and (c) encompass "any person, directly or indirectly" who offers or sells unregistered securities, liability is not limited to the direct offeror or seller, but also includes any person who is a "necessary participant" and a "substantial factor" in the offer or sale. *SEC v. Blackburn*, No. 15-2451, 2015 WL 10911439, *3 (E.D. La. Sept. 11, 2015). "A defendant is a necessary participant if 'but for' his participation in the distribution of unregistered securities, the sale transaction would not have taken place. . . [and] is a substantial factor in the distribution of unregistered securities if his overall conduct and participation is not 'de minimis.'" *Id.* (internal citations omitted). Here, the evidence establishes as a matter of law each element of Section 5.

## 1. Defendants offered and sold securities.

Defendants each admit to inviting others, many of whom were located in states across the country, to invest in CryptoFX, and multiple such investors invested in Venture Agreements as a result. Ex. 8, Sanchez Depo. 34:4-14, 89:12-23, 90:20-25 [APP. 339, 375-376] (investors from Illinois and Michigan); Ex. 4, Turcios Depo. 99:8-15, 100:20-23 [APP. 214-215]; Ex. 41, Contracts, at SEC-ReceiverLJ-E-0005075 [APP. 1736] (investor in Missouri); Ex. 2, Saravia 3/12/25 Depo. 46:15-47:7 [APP. 95-96]; Ex. 42, Contracts, at APP. 1749 (investor in California); Ex. 1, Zavala Depo. 28:14-29:1 [APP. 15-16]; Ex. 43, Contracts, at APP. 1760 (investor in California).

The evidence also shows that Defendants directly offered and sold the Venture Agreements: **Saravia** posted in an online group chat soliciting investors if they needed to "make a contract." Ex. 21, Group Chat, at CFX_016628 [APP. 737].

**Sanchez** also advertised meetings in group chats and arranged monthly in-person and Zoom meetings in which Chavez and others pitched investment in CryptoFX. Ex. 8, Sanchez Depo. 26:19-27:14, 36:14-37:8, 45:4-24, 62:12-23, 63:1-9, 145:3-146:14 [APP. 333-334, 341-342, 346, 358-359, 404-405]; Ex. 44, Group Chat, at CFX_017311 [APP. 2049]. He also promoted and gave regular presentations about crypto-assets, knowing full well investors would attend and invest in CryptoFX rather than in crypto-assets. Ex. 24, Group Chat, at CFX_019004 [APP. 873]; Ex. 1, Sanchez Depo. 39:15-40:5, 44:11-18 [APP. 343-345]. He then hosted two large events, both of which were later posted on

YouTube, in Houston and Chicago to promote CryptoFX and sign up new investors. Ex. 8, Sanchez Depo. 76:8-77:25, 78:10-79:18, 80:20-23 [APP. 370-374].

**Turcios** and **Zavala** similarly advertised via group chat and gave presentations in multiple cities to solicit investors in CryptoFX. Ex. 45, Puga Decl. ¶¶ 3-4 [APP. 2060]; Ex. 1, Zavala Depo. 36:5-39:6 [APP. 20-23]; Ex. 4, Turcios Depo. 86:13-24, 96:18-97:2 [APP. 205, 212-213]. **Turcios**, **Sanchez**, and **Zavala** further employed means of interstate communication by telling investors that they could invest via Bitcoin or wire. Ex. 49, Text [APP. 2065]; Ex. 8, Sanchez Depo. 105:19-106:25 [APP. 381-382]; Ex. 1, Zavala Depo. 102:5-11 [APP. 59]; Ex. 4, Turcios Depo. 124:12-15 [APP. 226].

The evidence similarly establishes that Defendants were necessary participants and substantial factors in the offer and sale of CryptoFX investments. In her group chat, **Saravia** not only solicited investors, but also posted promotions encouraging existing investors to bring in new investors and listed her own hours so she could assist investors. Ex. 21, Group Chat, at CFX_016588, 16597 - 16598, 16601 [APP. 697, 706-707, 710]. When she was in the office, Saravia would assist investors by explaining the investment, answering questions, collecting investor funds, and executing contracts on behalf of CryptoFX. Ex. 2, Saravia 3/12/25 Depo. 33:18-34:23, 35:10-24, 45:1-20, 58:13-59:1, 113:8-24 [APP. 85-87, 94, 105-106, 129].

**Turcios**, **Zavala**, and **Sanchez** ran CryptoFX offices and arranged meetings in which they and others promoted CryptoFX. Ex. 8, Sanchez Depo. 36:14-37:8, 39:15-40:16, 45:4-24, 61:3-63:9, 145:3-146:14 [APP. 341-344, 346, 357-359, 404-405]; Ex. 4,

Turcios Depo. 47:7-48:9, 53:8-24, 68:4-19 [APP. 193-194, 197, 204]; Ex. 10, Video [APP. 529]; Ex. 12, Trans. [APP. 531-534]; Ex. 1, Zavala Depo. 24:9-25:14, 29:2-4, 29:12-22, 30:11-18, 70:17-71:1 [APP. 11-12, 16, 17, 32-33].

During the events he hosted in Chicago and Houston, which were both posted online, **Sanchez** also encouraged investors to bring in new investors. Ex. 18, Trans. [APP. 549-609]; Ex. 46, Video [APP. 2062]; Ex. 8, Sanchez Depo. 76:2-79:21, 80:20-23 [APP. 370-374]. New investors signed Venture Agreements during and after these events. Ex. 8, Sanchez Depo. 78:10-23 [APP. 372].

On behalf of CryptoFX, Defendants all coordinated the collection of investor funds and information using online spreadsheets or means of interstate transportation to transmit investor funds. Ex. 4, Turcios Depo. 51:5-52:25, 94:19-95:9, 121:7-14, 122:7-123:1, 124:12-15 [APP. 195-196, 210-211, 223-226]; Ex. 2, Saravia 3/12/25 Depo. 35:10-24, 58:13-59:1, 65:13-66:12, 85:10-90:10, 92:16-23 [APP. 87, 105-106, 110-111, 115-121]; Ex. 8, Sanchez Depo. 103:2-104:19, 109:19-110:24, 121:14-122:4 [APP. 379-380, 383-384, 394-395]; Ex. 1, Zavala Depo. 87:13-89:4 [APP. 44-46].

## 2. No registration statement was in effect.

It is undisputed that the offers and sales of the Venture Agreements were not registered with the SEC. Ex. 52, Haussecker Decl. ¶¶ 4-6 [APP. 2078].

## 3. Defendants used means of interstate communication and transportation.

As noted in Section I.B.1 above, Defendants used the internet (e.g. YouTube, online group chats), Zoom meetings, texts, highways, and other interstate means to solicit

and sell the Venture Agreements to investors. Therefore, there is no genuine dispute that Defendants used means of interstate communication and/or transportation in the offer or sale of unregistered securities. *See Silea*, 2022 WL 269105, at *9 ("beyond dispute" that defendants who "used online networking platforms, email, and other means to solicit and communicate with potential investors" who lived in and outside of Texas engaged in interstate activity under Section 5); *SEC v. Carter*, No. 4:19-CV-100-SDJ, 2020 WL 6304889, at *4 (E.D. Tex. Oct. 28, 2020) (concluding that communicating with potential investors through email, obtaining investments from at least one out-of-state investor, and obtaining investor funds through wire transfer established violations of Section 5(a) and (c)); *SEC v. Straub*, 921 F. Supp. 2d 244, 262 (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce'").

### 4. Defendants cannot prove an exemption from registration.

Having established prima facie Section 5 violations, the burden of proof shifts to Defendants to establish an exemption from registration. *Cont'l Tobacco,* 463 F.2d at 156. They cannot. Exemptions from registration are construed narrowly "in order to further the purpose of the [Securities] Act: To provide full and fair disclosure of the character of the securities, and to prevent frauds in the sale thereof." *Id.* at 155 (exempted transactions must be "narrowly viewed" since the Securities Act "is remedial legislation entitled to a broad construction"); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1087 (9th Cir. 2010). None of the exemptions from the registration requirements of Section 5 apply to the facts and circumstances of this case.

For all the foregoing reasons, summary judgment is warranted on the SEC's

Section 5 claims.  *See Silea*, 2022 WL 269105, at *9 (finding that unregistered sales of

membership interests in purported investment fund violated Section 5).

II.     **The SEC is entitled to summary judgment on its Exchange Act Section 15(a)
        claims against Defendants.**

Section 15(a) makes it

> unlawful for any broker or dealer [. . .] to make use of the mails or any means
> or instrumentality of interstate commerce to effect any transactions in, or to
> induce or attempt to induce the purchase or sale of, any security [. . .] unless
> such broker or dealer is registered.

15 U.S.C. § 78o(a)(1).  Scienter is not an element of Section 15(a).  *SEC v. Moss*, No.

4:20-CV-972-SDJ, 2022 WL 757226, at *6 (E.D. Tex. Mar. 11, 2022).

A "broker" is "any person engaged in the business of effecting transactions in

securities for the account of others."  15 U.S.C. § 78c(a)(4)(A).  To determine whether an

individual qualifies as a broker, most courts apply a list of nonexclusive factors: (1)

"regular participation in securities transactions," (2) "employment with the issuer of the

securities," (3) "payment by commission as opposed to salary," (4) "history of selling the

securities of other issuers," (5) "involvement in advice to investors," and (6) "active

recruitment of investors."  *Moss*, 2022 WL 757226, at *6 (citing *SEC v. Collyard*, 861

F.3d 760, 766 (8th Cir. 2017)); *see also SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL

2413, at *10 (S.D.N.Y April 6, 1984) (listing similar factors).

Active participation in the actual solicitation of investors is not required for a party

to be a broker: it is enough that the defendant demonstrates a "certain regularity of

participation in securities transactions at key points in the chain of distribution."  *SEC v.*

*Helms*, No. A-13-CV-01036 ML, 2015 WL 5010298, at *16 (W.D. Tex. Aug. 21, 2015) (citing *SEC v. Martino,* 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003)). "Transaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer." *SEC v. Bowen*, No. 3:22-CV-1415-S, 2024 WL 3462359, at *11 (N.D. Tex. July 17, 2024) (quotations omitted).

Again, the undisputed evidence establishes that Defendants violated Section 15(a) as a matter of law. Defendants were neither registered with the Commission as brokers or dealers nor associated with a registered broker or dealer. Ex. 52, Haussecker Decl. ¶ 8 [APP. 2079]. The evidence cited above in Section I.B likewise shows that Defendants used instrumentalities of interstate commerce—including video teleconferencing, group chats, highways, and telephones—to effect transactions in, or to induce the purchase and sale of, the Venture Agreements.

The undisputed evidence also establishes that Defendants acted as brokers. Each of the Defendants regularly participated in the offer and sale of securities by arranging meetings, answering investor questions, or encouraging investors to invest. Ex. 2, Saravia Depo. 33:18-34:23, 35:10-24, 45:1-20 [APP. 85-87, 94]; Ex. 4, Turcios Depo. 48:10-16, 94:19-95:9, 95:17-96:3 [APP. 194, 210-212]; Ex. 8, Sanchez Depo. 49:5-50:2 [APP. 350-351]; Ex. 1, Zavala Depo. 26:4-14, 40:2-41:5 [APP. 13, 24-25].

All of the Defendants were ostensibly employed by CryptoFX. However, they did not receive salaries and instead were only paid commissions based on the amount of investor funds they helped to bring in. Ex. 4, Turcios Depo. 111:4-112:21 [APP. 221-

222]; Ex. 2, Saravia 3/12/25 Depo. 100:18-101:4, 102:3-12 [APP. 124-126]; Ex. 8, Sanchez Depo. 102:2-8 [APP. 378]; Ex. 1, Zavala Depo. 101:16-102:1 [APP. 58-59]. Indeed, it is undisputed that each of the Defendants received transaction-based compensation. Ex. 8, Sanchez Depo. 66:20-67:24, 101:9-102:1 [APP. 362-363, 377-378]; Ex. 4, Turcios Depo. 103:11-104:8, 106:19-108:6, 111:4-112:21 [APP. 216-222]; Ex. 2, Saravia 3/12/25 Depo. 46:15-47:20, 100:18-101:4, 102:3-12 [APP. 95-96, 124-126]; Ex. 1, Zavala Depo. 101:16-102:1 [APP. 58-59].

Defendants also actively recruited and provided advice to potential investors. Among other conduct discussed above, Defendants shared their experiences and successes with CryptoFX, and Zavala, Saravia, and Turcios all assisted investors in executing Venture Agreements, signed contracts on behalf of CryptoFX, and told investors that CryptoFX was a safe, secure, and "good" investment. Ex. 45, Puga Decl. ¶¶ 3-4 [APP. 2060]; Ex. 19, Portillo Decl. ¶ 5 [APP. 611]; Ex. 4, Turcios Depo. 43:11-45:25, 53:25-56:8, 56:16-58:4 [APP. 190-192, 197-202]; Ex. 2, Saravia 3/12/25 Depo. 33:18-34:23, 35:10-24, 45:1-20, 58:13-59:1, 113:8-24 [APP. 85-87, 94, 105-106, 129]; Ex. 1, Zavala Depo. 26:4-14, 39:14-40:1, 98:21-100:6 [APP. 13, 23-24, 55-57]; Ex. 8, Sanchez Depo. 49:5-50:2 [APP. 350-351] (admitting he would tell investors about his returns when asked). Sanchez similarly pitched CryptoFX as an opportunity to change investors' lives and hosted events in which he encouraged others to bring in new investors and obtain commissions. Ex. 20, Llangari Decl. ¶ 3 [APP. 614]; Ex. 16, Video [APP. 547]; Ex. 18, Trans. [APP. 549-609]; Ex. 46, Video [APP. 2062].

Based on all of this evidence, Defendants violated Section 15(a) as a matter of law, and summary judgment should be granted. *See SEC v. Thomas*, No. 2:19-CV-01515, 2021 WL 5826279, at *8 (D. Nev. Aug. 24, 2021) (granting summary judgment on Section 15(a) claim and holding defendants were brokers when they received commissions, coordinated execution of investment agreements, and communicated with investors regarding investment validity and returns).

III. **The SEC is entitled to summary judgment on its Securities Act Section 17(a)(2) and Exchange Act Rule 10b-5(b) claims against the Fraud Defendants.**

To establish liability under Section 17(a)(2) of the Securities Act and Rule 10b-5(b) promulgated under Section 10(b) of the Exchange Act, the SEC must prove by a preponderance of the evidence: (a) a misrepresentation or omission of a fact; (b) that is material; (c) that is made in connection with the purchase, offer, or sale of a security; (d) with the requisite mental state; and (e) using means or instrumentalities of interstate commerce. 17 C.F.R. § 240.10b-5; *SEC v. Gann*, 565 F. 3d 932, 936 (5th Cir. 2009). Section 17(a)(2) also states that a defendant must, directly or indirectly, "obtain money or property" by means of a false or misleading statement. *See* 15 U.S.C. § 77q(a)(2). Violations of Section 10(b) and Rule 10b-5(b) require a showing of scienter, while violations of Section 17(a)(2) require only negligence. *See SEC v. Hopper*, No. Civ. H-04-1054, 2006 WL 778640 at *9 (S.D. Tex. Mar. 24, 2006). Defendants' use of the means of interstate commerce is addressed in Section I.B.3 *infra*.

### A. The Fraud Defendants made misrepresentations and omissions to investors in order to obtain money.

**Saravia** made multiple misrepresentations, including (1) assuring one investor that CryptoFX was not a scheme and that the investment would not lose money, even if there was a panic; (2) assuring the same investor that CryptoFX was legitimate and not a scheme; (3) assuring the investor he would earn returns; and (4) repeating statements by others to investors that CryptoFX was investing investor funds in crypto-assets and forex. Ex. 19, Portillo Decl. ¶ 5 [APP. 611]; Ex. 2, Saravia 3/12/25 Depo. 50:22-51:16, 55:23-56:16 [APP. 97-98, 102-103]. These statements were all false because CryptoFX was a Ponzi scheme. Investor funds were not safe but instead were at severe risk. Saravia also made misleading omissions by speaking to investors about the use of their funds but failing to disclose that funds were not being used to invest and gain returns, as represented. She knew as much because she regularly received copies of her spreadsheet, which showed that investor returns were being paid out of investor funds. Ex. 2, Saravia 3/12/25 Depo. 81:25-82:20; *see also Bowen*, 2024 WL 3462359, at *6 ("a duty to speak the full truth on a particular subject arises when a defendant undertakes to say anything on that particular subject") (citation and italics omitted).

**Zavala** made similar misrepresentations and omissions to investors by stating that (1) CryptoFX would use investor funds to trade in crypto and forex, (2) investors would earn returns, including doubling their money within a year, through the proceeds generated by CryptoFX's trading, and (3) the investment was safe and secure. Ex. 1, Zavala Depo. 24:9-25:14, 36:5-39:6 [APP. 11-12, 20-23]; Ex. 45, Puga Decl. ¶ 4 [APP.

2060].  These statements were all false because CryptoFX did not use investor funds to trade in crypto-assets or forex.  Ex. 5, Lewis Decl. ¶ 4.d [APP. 232].  Investor funds were therefore not safe but were instead used to pay off existing investors.  After CryptoFX was placed in receivership, Zavala made additional false statements, including representing that (4) 24/7 Academy was a "solution" to CryptoFX's problems and (5) it would give investors passive returns based on Chavez's forex trades.  Ex. 40, Trans., at 1-6, 9 [APP. 1690-1695, 1698].  In truth, 24/7 Academy was a perpetuation of the same scheme.  Ex. 1, Zavala Depo. 116:22-117:2, 119:9-12 [APP. 62-64].

**Sanchez** similarly made misstatements and omissions to investors, representing that (1) they could earn significant commissions, enough to retire or earn six-figure sums, and (2) he was a crypto expert who had earned $11 million in two years through crypto-assets.  Ex. 18, Trans., at 21 [APP. 569].  These statements were both false: investors could not gain significant commissions because CryptoFX was a precariously constructed Ponzi scheme that generated no returns from trading activity.  Sanchez also admits that he never made $11 million, and that he does not consider himself an expert in crypto.  Ex. 8, Sanchez Depo. 23:8-10, 64:18-66:9 [APP. 332, 360-362].  Sanchez also (3) failed to disclose to at least one investor that he would use the investor's funds to purchase a property rather than to invest in CryptoFX.  *See* Ex. 20, Llangari Decl. ¶¶ 7, 11 & Att. SEC-LlangariMJ-E-0000001-2 [APP. 615-616, 618-619]; Ex. 36, Single Ledger Balance, at CTofTxLLC0213 [APP. 1680]; Ex. 37, Wire Notice, at CTofTxLLC1498 [APP. 1686].  Following CryptoFX's closure, Sanchez again misled investors by telling them that (4)

they should not worry about the SEC's lawsuit and (5) they must invest in 24/7 Academy in order to recoup their investments in CryptoFX. Ex. 25, Velez Decl. ¶ 8 [APP. 1338]. In reality, 24/7 was part of the scam. Ex. 1, Zavala Depo. 119:9-12 [APP. 64].

All of the Fraud Defendants obtained money, directly and indirectly, in the form of commissions from the foregoing false statements. Ex. 2, Saravia 3/12/25 Depo. 100:18-101:4, 102:3-12 [APP. 124-126]; Ex. 8, Sanchez Depo. 66:23-67:24, 102:2-8 [APP. 362-363, 378]; Ex. 1, Zavala Depo. 101:16-102:1 [APP. 58-59].

### B. The Fraud Defendants' misrepresentations and omissions were material.

"[A] statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *SEC v. Seghers*, 298 F. App'x 319, 328 (5th Cir. 2008) (quoting *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 359 (5th Cir. 2002)).

**Saravia**'s statements regarding the safety, security, and legitimacy of the CryptoFX investment were material, as an investor would want to know how her funds were actually being used, whether they were actually safe, and whether she would actually receive returns. *See Silea*, 2022 WL 269105, at *10 (finding material statements that investments had a "safety net" protection up to 50% of investment); *SEC v. Teshuater, LLC*, No. 4:20-CV-01187, 2024 WL 1348432, at *6 (S.D. Tex. Mar. 29, 2024) (holding statements that investor funds would be used to operate company, when funds were used to pay for personal expenses, were material).

**Zavala**'s statements that CryptoFX would use investor funds to trade, that investors would earn returns through CryptoFX's trading, that the investment was safe, and that 24/7 Academy was a "solution" that would generate passive returns were material for the same reasons. *Silea*, 2022 WL 269105, at *10; *Teshuater*, 2024 WL 1348432, at *6.

**Sanchez**'s statements regarding commissions, investing in 24/7 Academy, and his failure to disclose his misappropriation of an investor's funds were also all material because a reasonable investor would want to know how or if his money is being invested. *Teshuater*, 2024 WL 1348432, at *6. Sanchez's statements regarding his expertise and experience are similarly material because a reasonable investor would want to know about the actual background of the person leading investment efforts. *See SEC v. Milles*, No. 1:19-cv-714, 2022 WL 206808, at *4 (W.D. Tex. Jan. 24, 2022) (holding false representations regarding defendants' professional experience with oil-and-gas offerings and promised returns were material).

### C. The Fraud Defendants' statements were made in connection with the offer/sale/purchase of a security in interstate commerce.

The Supreme Court has taken a broad view of the "in connection with" requirements of Sections 17(a) and 10(b), saying "it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else.". *SEC v. Blackburn*, No. CV 15-2451, 2020 WL 1166995, at *2 (E.D. La. Mar. 11, 2020), (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006)).

Here, there is no genuine dispute that **Saravia**'s statements were made in connection with the purchase or sale, and in the offer or sale, of the Venture Agreements. Ex. 19, Portillo Decl. ¶ 5 [APP. 611]; Ex. 2, Saravia 3/12/25 Depo. 50:22-51:16, 55:23-56:16 [APP. 97-98, 102-103]; *see, e.g., Carter*, 2020 WL 6304889, at *6 (finding "in connection with" element satisfied where defendant's conduct was aimed at obtaining "capital from investors").

**Zavala** admits that his statements were made as part of his pitch to investors. Ex. 1, Zavala Depo. 24:9-25:14, 36:5-39:6 [APP. 11-12, 20-23]. Zavala's statements regarding 24/7 Academy, which Zavala admits was the "same concept" as CryptoFX, were likewise made in connection with the purchase or sale, and in the offer or sale, of investment contracts. *Id.* at 116:22-117:2 [APP. 62-63].

**Sanchez**'s statements regarding the potential to earn commissions, his own expertise, and his failure to disclose his misappropriation of investor funds were all made in connection with the offer or sale of Venture Agreements. *See* Ex. 18, Trans., at 29-45 [APP. 577-593]; Ex. 8, Sanchez Depo. 61:16-62:5, 64:18-66:9, 68:4-73:9, 78:10-79:21 [APP. 357-358, 360-362, 364-369, 372-373]; Ex. 20, Llangari Decl. ¶ 7 [APP. 615]. His assurances to investors that they should not worry about the SEC's lawsuit were also made in an event where Venture Agreements were offered and sold. Ex. 8, Sanchez Depo. 78:10-23 [APP. 372]; Ex. 25, Velez Decl. ¶¶ 5-6 [APP. 1337]. Furthermore, his statements that investors must invest in 24/7 Academy to get their CryptoFX returns were made in connection with the offer or sale of investments with 24/7 Academy, which was

just a perpetuation of the CryptoFX scheme. *SEC v. Farnsworth*, 692 F. Supp. 3d 157, 189 (S.D.N.Y. 2023) ("Any statement that is reasonably calculated to influence the average investor satisfies the 'in connection with' requirement of Rule 10b-5.").

### D. The Fraud Defendants acted with scienter.

Scienter may be established by showing a defendant acted intentionally or with severe recklessness. *Seghers*, 298 F. App'x at 333. Severe recklessness includes "highly unreasonable omissions or misrepresentations that constitute an extreme departure from the standards of ordinary care" and "present a danger of misleading buyers or sellers that the defendant either knows exists, or is so obvious a danger that he must have been aware of it." *SEC v. Provident Royalties, LLC*, No. 3:09-CV-01238-L, 2013 WL 5314354, at *5 (N.D. Tex. Sept. 23, 2013).

The Fraud Defendants each have *admitted* to knowing the returns and commissions being paid out were coming from new investor money. Ex. 8, Sanchez Depo. 103:2-104:4, 114:25-118:17 [APP. 379-380, 388-392]; Ex. 51, Saravia 12/15/22 Depo. 140:1-14 [APP. 2075]; Ex. 1, Zavala Depo. 86:10-25 [APP. 43]. They each also maintained a Leader Spreadsheet, which showed on a monthly basis that they were making Ponzi payments out of new investor funds. *See* Ex. 31, Saravia Spreadsheet [APP. 1382]; Ex. 32, Sanchez Spreadsheet [APP. 1383-1667]; Ex. 33, Zavala Spreadsheet [APP. 1668]. And even though the Fraud Defendants each worked for CryptoFX for well over a year, they each admit that they only asked, at most, two or three times about how much CryptoFX was obtaining in trading returns, and none ever pursued

the issue sufficiently to make an informed determination about whether CryptoFX was making enough in its purported trading activity to cover the payments they were making to investors. Ex. 1, Zavala Depo. 90:2-19, 91:13-92:10 [APP. 47-49]; Ex. 2, Saravia 3/12/25 Depo. 31:3-17, 32:2-11 [APP. 83-84]; Ex. 8, Sanchez Depo. 28:1-30:25 [APP. 335-337]. Indeed, Sanchez testified that when he asked individuals at CryptoFX's headquarters to send money to help cover investor return payments, he was told to bring in more investors. Ex. 8, Sanchez Depo. 118:18-119:6, 135:22-136:12 [APP. 392-393, 399-400]. Defendants therefore knew, or at a minimum were severely reckless in not knowing, that their statements that CryptoFX was using investor funds to trade, that the investment was secure, and that investors would earn returns were false. *See Silea*, 2022 WL 269105, at *12 (concluding that defendants' course of conduct, including making material misstatements and paying Ponzi payments to investors, were "steeped in deception" and established scienter).

**Zavala** similarly knew that his statements regarding 24/7 Academy were false because he was already aware that CryptoFX relied on new investor funds to pay off old investors. Ex. 1, Zavala Depo. 86:10-25 [APP. 43]. He was further aware that CryptoFX had been sued for being a Ponzi scheme and that its assets had been frozen. *Id.* at 115:18-23, 121:9-13 [APP. 61, 65]. Even so, he encouraged investors to invest in 24/7 Academy and promised passive returns through the trading of Chavez and others. Ex. 40, Trans., at 1-6, 9 [APP. 1690-1695, 1698].

**Sanchez** now admits that his statements framing himself as a crypto expert who had earned $11 million were false when made. Ex. 8, Sanchez Depo. 64:18-66:9 [APP. 360-362]. Sanchez likewise knew that he was misappropriating investor funds because he arranged for the transfer of investor funds to purchase property and later received the related deed. Ex. 20, Llangari Decl. ¶¶ 7, 11 [APP. 615-616]; Ex. 50, Letter (forwarding deed after closing) [APP. 2066]. Sanchez also knew, or was severely reckless in not knowing, that his statements regarding 24/7 Academy and the SEC's lawsuit were false. When he made the statements, he knew or should have known CryptoFX had only been able to pay investor returns by making Ponzi payments, not sourced from returns obtained by CryptoFX's trading. Ex. 8, Sanchez Depo. 103:2-7, 118:18-119:6, 135:22-136:12 [APP. 379, 392-393, 399-400]. *See SEC v. Shavers*, No. 4:13-CV-416, 2014 WL 4652121, at *9 (E.D. Tex. Sept. 18, 2014) (finding that defendant's statements denying Ponzi scheme showed intent to deceive). There is therefore no genuine issue of fact regarding the Fraud Defendants' violations of Section 17(a)(2) and Rule 10b-5(b), and summary judgment should be granted on these claims.

**IV.  The SEC is entitled to summary judgment on its Securities Act Sections 17(a)(1) and (3) and Exchange Act Rules 10b-5(a) and (c) claims against the Fraud Defendants.**

To establish liability under Section 17(a)(1) and (3) of the Securities Act and Rule 10b-5(a) and (c) promulgated under Section 10(b) of the Exchange Act, the Commission must establish by the preponderance of the evidence "the employment of any device, scheme, or artifice to defraud; and the engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit" in the offer or sale, or in connection

with the purchase or sale, of securities. *SEC v. Narayan*, No. 3:16-CV-1417-M, 2017 WL 4652063, at *3 (N.D. Tex. Aug. 28, 2017); 17 C.F.R. § 240.10b-5; 15 U.S.C. §§ 77q(a)(1) & (3).

A. **The Fraud Defendants participated in a fraudulent scheme and device in connection with the offer, purchase, and sale of Venture Agreements.**

The Fraud Defendants were integral to CryptoFX's long-running and massive Ponzi scheme. As described in Section I.B above, the Fraud Defendants all solicited investors directly and indirectly. They knowingly made or assisted in the making of Ponzi payments from new investor money. Ex. 8, Sanchez Depo. 103:2-104:4, 114:25-118:17 [APP. 379-380, 388-392]; Ex. 2, Saravia 3/12/25 Depo. 81:25-82:20 [APP. 113-114]; Ex. 51, Saravia 12/15/22 Depo. 140:1-14 [APP. 2075]; Ex. 1, Zavala Depo. 86:10-25 [APP. 43]; *see also SEC v. Helms*, No. A-13-CV-01036, 2015 WL 5010298, at *13 (W.D. Tex. Aug. 21, 2015) ("The SEC has therefore established that [defendants] operated a Ponzi scheme, which is, by definition, a 'fraudulent scheme.'"). They collected investor money, signed Venture Agreements on behalf of CryptoFX, and tracked investor information. Ex. 2, Saravia 3/12/25 Depo. 33:18-34:23, 35:10-24, 45:1-20, 58:13-59:1, 89:10-90:10, 92:16-23, 113:8-24 [APP. 85-87, 94, 105-106, 119-121, 129]; Ex. 8, Sanchez Depo. 103:2-104:19, 109:19-110:24, 121:14-122:4 [APP. 379-380, 383-384, 394-395]; Ex. 1, Zavala Depo. 80:19-24, 81:13-82:2, 87:13-89:4, 93:6-94:4 [APP. 37-39, 44-46, 50-51]. They also coordinated the efforts of investors and perpetuated the scheme by circulating invites and promotions to encourage others to bring in new investors. Ex. 8, Sanchez Depo. 46:11-47:7, 47:19-48:9, 62:12-23, 63:1-9,

135:7-22, 143:8-24, 145:3-146:14 [APP. 347-349, 358-359, 399, 402, 404-405]; Ex. 44, Trans., at CFX_017311 [APP. 2049]; Ex. 21, Group Chat, at CFX_016588, 16597, 16601 [APP. 697, 706, 710]; Ex. 9, Group Chat, at SEC-ReceiverLJ-E-0002756 [APP. 433].

**Zavala** and **Sanchez** hosted presentations and events in multiple cities across the country where they promoted CryptoFX to new investors and encouraged attendees to find new investors.  Ex. 18, Trans. [APP. 549-609]; Ex. 46, Video [APP. 2062]; Ex. 8, Sanchez Depo. 76:8-77:25, 78:10-79:18, 80:20-23 [APP. 370-374]; Ex. 1, Zavala Depo. 34:2-11, 36:5-39:6 [APP. 19-23].  The Fraud Defendants each also maintained a spreadsheet so they could coordinate with CryptoFX accounting, which in turn helped prop up the fraud by ensuring that CryptoFX could track its inflows and outflows.  Ex. 2, Saravia 3/12/25 Depo. 65:13-66:12, 67:12-15, 85:10-90:10, 92:16-23 [APP. 110-112, 115-121] (explaining use and function of spreadsheet); Ex. 8, Sanchez Depo. 109:19-110:24, 112:9-118:17 [APP. 383-384, 386-392] (same); Ex. 1, Zavala Depo. 82:3-87:12, 89:10-21 [APP. 39-44, 46] (same).

**Sanchez** further participated in a scheme to defraud when he directed one investor to wire his investment funds to an account that Sanchez controlled.  Ex. 20, Llangari Decl. ¶ 7 [APP. 615].  Sanchez did not disclose to the investor that he would use the funds to purchase a property rather than invest in CryptoFX.  *See id.* ¶ 11 & Att. SEC-LlangariMJ-E-0000001-2 [APP. 616, 618-619]; Ex. 36, Single Ledger Balance, at CTofTxLLC0213 [APP. 1680]; Ex. 37, Wire Notice, at CTofTxLLC1498 [APP. 1686].

In the end, **Zavala** and **Sanchez** also tried to conceal the scheme after the SEC filed suit against CryptoFX. Zavala hosted a call in which he pitched 24/7 Academy as a "solution" for CryptoFX's problems. Ex. 40, Trans., at 1 [APP. 1690]. Sanchez similarly told investors not to worry about the lawsuit, circulated promotions for commissions to those who brought in new investors, and told investors that they needed to invest in 24/7 Academy to increase their chances of being repaid for their CryptoFX investments. Ex. 25, Velez Decl. ¶¶ 5-8 [APP. 1337-1338]. Both Zavala and Sanchez furthermore knowingly signed on new investors in September and October 2022, even though they knew or were severely reckless in not knowing that CryptoFX was unable to pay back investors. *See* Ex. 32, Sanchez Spreadsheet [APP. 1383-1667]; Ex. 33, Zavala Spreadsheet [APP. 1668]; Ex. 1, Zavala Depo. 90:2-19, 91:13-92:10 [APP. 47-49]; Ex. 8, Sanchez Depo. 118:18-119:6, 135:22-136:12 [APP. 392-393, 399-400]. Based on these facts, there is no genuine dispute that the Fraud Defendants participated in a fraudulent scheme, device, or artifice to defraud, and/or engaged in acts, practices, or courses of business that operated as a fraud or deceit. *See Milles*, 2022 WL 206808, at *4 (holding that evidence of participation in Ponzi scheme established scheme liability); *see also SEC v. Holschuh*, 694 F.2d 130, 143–44 n.24 (7th Cir. 1982) ("A scheme to defraud may well include later efforts to avoid detection of the fraud.").

### B. The Fraud Defendants acted with scienter.

Defendants' scienter is established by the same facts cited above in Section III.D. Defendants knew, or were severely reckless in not knowing, that CryptoFX was a fraudulent scheme because they were longtime participants who made Ponzi payments on

CryptoFX's behalf and took steps to conceal the fraud.  *See SEC v. Farmer*, No. 4:14-CV-2345, 2015 WL 5838867, at *11 (S.D. Tex. Oct. 7, 2015) (holding scienter was established because Defendant was "heavily involved" in the scheme from its inception and for over a year).

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant this Motion and grant the SEC such other relief to which it may be entitled.


Dated: June 13, 2025                    Respectfully submitted,

                                        UNITED STATES SECURITIES AND
                                        EXCHANGE COMMISSION

                                        */s/ Tyson M. Lies*
                                        Matthew J. Gulde
                                        Illinois Bar No. 6272325
                                        S.D. Texas Bar No. 1821299
                                        Tyson M. Lies
                                        Texas Bar No. 24087927
                                        S.D. Texas Bar No. 3865116
                                        Jillian Harris
                                        Texas Bar No. 24087671
                                        S.D. Texas Bar No. 2669497
                                        United States Securities and
                                        Exchange Commission
                                        Burnett Plaza, Suite 1900
                                        801 Cherry Street, Unit 18
                                        Fort Worth, TX  76102
                                        Telephone:  (817) 978-1410
                                        Facsimile:  (817) 978-4927
                                        guldem@sec.gov
                                        liest@sec.gov
                                        harrisji@sec.gov

## CERTIFICATE OF SERVICE

I affirm that on June 13, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court for the Southern District of Texas, Houston Division, by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.


*/s/ Tyson M. Lies*
Tyson M. Lies