IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ISMAEL ZARCO SANCHEZ, | ) |
| GABRIEL ARGUELLES, | ) |
| HECTOR AQUINO, | ) |
| GLORIA CASTANEDA, | ) |
| ORLIN WILIFREDO TURCIOS CASTRO, | ) |
| CARMEN DE LA CRUZ, | ) |
| ELIZABETH ESCOTO, | ) Civil Action No 4:24-cv-939 |
| REYNA GUIFFARO, | ) |
| MARCO ANTONIO LEMUS, | ) JURY TRIAL DEMANDED |
| DULCE OCHOA, | ) |
| GABRIEL OCHOA, | ) |
| JUAN PUAC, | ) |
| MARIA SARAVIA, | ) |
| LUIS SERRANO, | ) |
| JULIO TAFFINDER, | ) |
| CLAUDIA VELAZQUEZ, and | ) |
| ROBERTO ZAVALA, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>AND MOTION TO SUPPLEMENT RECORD</u>**

## TABLE OF CONTENTS

                                                                                                                  **Page**

TABLE OF AUTHORITIES ................................................................................................. iii

OBJECTION AND MOTION TO SUPPLEMENT
SUMMARY JUDGMENT EVIDENCE .................................................................................. 2

ARGUMENT ........................................................................................................................... 3

    A.     The Venture Agreements are securities ...................................................... 3

            1.     A common enterprise existed because investors relied on Chavez's and CryptoFX's expertise to obtain returns ................................... 5

            2.     Investors expected returns solely through the efforts of Chavez/CryptoFX ..................................................................................... 8

    B.     The evidence establishes that Sanchez committed fraud ........................... 9

            1.  Sanchez represented to investors that he had made $11 million ........ 11

            2.  Sanchez acted with scienter ................................................................ 11

CONCLUSION ..................................................................................................................... 13

# Table of Authorities

**Cases**

*Aaron v. SEC*,
　446 U.S. 680 (1980) .................................................................................................. 10

*Kitchen v. BASF*,
　952 F.3d 247 (5th Cir. 2020) ................................................................................ 2, 10

*Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.* (*In re Living Bens. Asset Mgmt., L.L.C.*),
　916 F.3d 528 (5th Cir. 2019) ...................................................................................... 4

*Long v. Shultz Cattle Co.*,
　881 F.2d 129 (5th Cir. 1989) ................................................................................... 4, 5

*Reves v. Ernst & Young*,
　494 U.S. 56 (1990) ...................................................................................................... 4

*Scruggs v. Qualitech Maint., Inc.*,
　No. CV H-06-3392, 2007 WL 9736214 (S.D. Tex. Dec. 7, 2007) ............................. 3

*SEC v. Gann*,
　565 F.3d 932 (5th Cir. 2009) ...................................................................................... 9

*SEC v. Koscot Interplanetary, Inc.*,
　497 F.2d 473 (5th Cir. 1974) ...................................................................................... 9

*SEC v. Narayan*,
　No. 3:16-CV-1417-M, 2017 WL 4652063 (N.D. Tex. Aug. 28, 2017) ............... 9-10

*SEC v. Provident Royalties, L.L.C.*,
　No. 3:09-CV-01238-L, 2013 WL 5314354 (N.D. Tex. Sept. 23, 2013) .................. 11

*SEC v. Seghers*,
　298 F. App'x 319 (5th Cir. 2008) ............................................................................ 11

*SEC v. Thompson*,
　732 F.3d 1151 (10th Cir. 2013) .................................................................................. 6

*SEC v. W.J. Howey Co.*,
　328 U.S. 293 (1946) ................................................................................................ 4, 9

*SEC v. Silea*,
　No. 4:20-CV-737-SDJ, 2022 WL 269105 (E.D. Tex. Jan. 27, 2022) ....................... 9

*Williamson v. Tucker*,
　645 F.2d 404 (5th Cir. 1981) ...................................................................................... 4

**Federal Statutes**
*Securities Act of 1933*

Section 5
    [15 U.S.C. § 77e] .................................................................................................. 2

Section 17
    [15 U.S.C. § 77q] ............................................................................................. 2, 10

*Securities Exchange Act of 1934*

Section 10
    [15 U.S.C. § 78j] .................................................................................................. 2

Section 15
    [15 U.S.C. § 78o] ................................................................................................. 2

Rule 10b-5(b)
    [17 C.F.R. § 240.10b-5(b)] ............................................................................. 2, 10

*Federal Rules of Civil Procedure*

    Fed. R. Civ. P. 32 ................................................................................................. 3

*Federal Rules of Evidence*

    Fed. R. Evid. 106 ................................................................................................. 3

Defendant Ismael Sanchez was a high-level promoter of CryptoFX, a multi-million-dollar Ponzi scheme. In his response to the SEC's Motion for Partial Summary Judgment (the "Motion"), he does not contest that CryptoFX was a Ponzi scheme or that investor money was not used to trade in crypto-assets, as CryptoFX had represented it would be. Regardless, he insists he is not liable for violating the securities laws because (1) CryptoFX was an "educational academy" and not selling securities subject to registration under the federal securities laws, and (2) he—despite being one of the primary promoters of CryptoFX for years—did not have the requisite scienter to commit fraud.

But Sanchez cannot evade liability by simply labeling CryptoFX or his own actions as innocuous. The undisputed evidence shows that CryptoFX was a Ponzi scheme that solicited investors to purchase investment contracts (called "Venture Agreements"), promising above-market returns through the purported trading efforts of its founder, Mauricio Chavez, and his team of traders. Indeed, the only thing that Sanchez points to in support of his claim that CryptoFX did not sell securities is language in the Venture Agreements. But that same language actually demonstrates that CryptoFX *was* an investment scheme and does not undermine the conclusion that the Venture Agreements were securities.

Furthermore, Sanchez tries to paint himself as an unwitting bystander in the CryptoFX scheme, yet he presents nothing to rebut the evidence showing he made Ponzi payments and knew, or was severely reckless in ignoring, that CryptoFX was a fraud. In fact, he fails to address: (a) his acts in furtherance of CryptoFX's fraudulent scheme (*see,*

*e.g.*, his personal misappropriation of investor funds at doc. 65, at 17-18), and (b) most of the misrepresentations and omissions that he made. There is therefore no dispute of fact as to Sanchez's knowledge and participation in the fraud and the Motion should be granted.

Importantly, Sanchez only challenges whether CryptoFX sold securities, whether he made a single misrepresentation (among many he does not address), and whether he possessed the requisite scienter. Apart from arguing that the Venture Agreements are not securities, he does not address the substance of the SEC's claims under Section 5 of the Securities Act of 1933 (the "Securities Act") or Section 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). He likewise does not address the other misrepresentations, omissions, and acts that form the bases for the SEC's claims of fraud against him under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, all of which are sufficient standing alone to establish the SEC's claims of fraud. Sanchez has accordingly waived his arguments as to these elements of the SEC's claims and the SEC is entitled to summary judgment on the same. *Kitchen v. BASF*, 952 F.3d 247, 253 (5th Cir. 2020).

**OBJECTION AND MOTION TO SUPPLEMENT SUMMARY JUDGMENT EVIDENCE**

In his response, Sanchez claims that Ana Munoz, an accounting employee from CryptoFX, testified that Sanchez "did not directly solicit investors of CryptoFX." Doc. 78, Resp. at 4. The SEC objects to this assertion, however, as it misstates Munoz's complete testimony. Munoz clarified in her deposition that she knew Sanchez hosted

educational classes, but she had no idea what Sanchez said in those meetings or if he solicited anyone because he worked in Chicago while she worked in Houston. Ex. 53, Munoz Depo. 281:3-283:13 [APP. 2080-2083]. The SEC accordingly offers additional portions of Munoz's deposition transcript pursuant to Federal Rule of Evidence 106 to provide a complete picture of her statements on these matters. These additional pages are attached to this reply brief as Exhibit 53. *See Scruggs v. Qualitech Maint., Inc.*, No. CV H-06-3392, 2007 WL 9736214, at *5 (S.D. Tex. Dec. 7, 2007) ("Pursuant to Federal Rule of Civil Procedure 32(a)(4) and Federal Rule of Evidence 106, when part of a deposition is offered, the adverse party may require the introduction of any other part of the deposition which ought in fairness to be considered contemporaneously with it."). All other citations within this reply are to the Appendix in support of the SEC's Motion (docs. 66-69).

## ARGUMENT

Sanchez contests his liability on two grounds: (A) he maintains that the Venture Agreements were not securities but simply records of payments to join an educational academy, and (B) there is a dispute of fact whether he committed fraud because (1) he did not make a representation regarding his crypto-asset earnings and (2) he did not act with scienter. These positions are not supported by the cited evidence, however, and therefore Sanchez fails to raise a genuine issue of material fact to defeat summary judgment.

**A.  The Venture Agreements are securities.**

An "investment contract" qualifies as a security if the contract meets three requirements: "(i) an investment of money; (ii) in a common enterprise; and (iii) on an

expectation of profits to be derived solely from the efforts of individuals other than the investor." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946); *Williamson v. Tucker*, 645 F.2d 404, 417-18 (5th Cir. 1981). Courts making a determination under *Howey* must disregard "legal formalisms" and instead focus on "the economics of the transaction." *Reves v. Ernst & Young,* 494 U.S. 56, 61 (1990). In the Fifth Circuit, courts apply the "broad vertical commonality test" to determine if a common enterprise exists. *Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.*, 916 F.3d 528, 536 (5th Cir. 2019) (quoting *Long v. Shultz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989)). Under this test, "the necessary interdependence may be demonstrated by the investors' collective reliance on the promoter's expertise." *Shultz Cattle*, 881 F.2d at 141.

As outlined in the Motion, the evidence establishes that (1) investors invested money into CryptoFX in exchange for Venture Agreements, (2) a "common enterprise" existed because investors pooled their funds and collectively relied upon the purported efforts and expertise of Chavez and CryptoFX to trade on their behalf, and (3) investors reasonably expected profits because they were told the investment was passive and that they could expect a return—typically in the range of 15% monthly or quarterly—solely through the purported crypto-asset and forex trading of CryptoFX. Doc. 65, Mot. at 21.

Sanchez only disputes that (1) a common enterprise existed and (2) that investors expected profits to be derived from the efforts of others. However, the evidence he cites in support of his arguments—primarily the Venture Agreements themselves—does not support his assertions, and he otherwise misconstrues the surrounding evidence in ways that are not supported by the record.

### 1. A common enterprise existed because investors relied on Chavez's and CryptoFX's expertise to obtain returns.

Sanchez maintains that no common enterprise existed because the Venture Agreements did not guarantee returns through the expertise of others. Doc. 78, Resp. at 10-11. He similarly tries to recast CryptoFX's investment seminars, saying that the seminars did not promise that CryptoFX would invest on investors' behalf but that investors would earn returns based on the strength of the crypto-asset markets and by bringing in other students. *Id.* at 11. He takes special pains to depict a seminar he personally led as a presentation about people becoming wealthy through crypto-asset investing. *Id.*

Sanchez's arguments, however, misrepresent the content of the Venture Agreements and the seminars. As an initial matter, Sanchez is incorrect in stating that the Venture Agreements did not state that investors should expect returns through the efforts of CryptoFX. The Venture Agreements state explicitly that CryptoFX (not investors) will be using investors' money to "invest" in crypto-assets and forex. *See, e.g.*, Ex. 41, Contracts [APP. 1738, 1740]. The Agreements also state that CryptoFX will pay a return to investors and reference the "risk" and "speculative" nature of crypto-asset and forex trading, thus underscoring that the Agreements were related to investments and not just tuition for an academy. *Id.* Sanchez insists that the Agreements do not guarantee a return, but that is not required to establish a common enterprise, only that investors rely on the expertise of the promoter (here, Chavez and CryptoFX). *Shultz Cattle*, 881 F.2d at 141. Furthermore, the absence of express statements in the Venture Agreements

regarding CryptoFX's expertise is irrelevant because Defendants and CryptoFX represented in meetings and other materials that investor money would be pooled and invested by Chavez and CryptoFX representatives to earn investors' returns. *See, e.g.*, Ex. 1, Zavala Depo. 36:5-39:6 [APP. 20-23]; Ex. 8, Sanchez Depo. 34:15-37:8 [APP. 339-342]. And any language within the Agreements (such as the insistence that CryptoFX was "not an investment company" or that it was "repaying tuition") did not alter the economics of the transactions. Sanchez himself acknowledged this when he testified "education packages, which is the name they gave the packages, but they were contracts." Ex. 8, Sanchez Depo. 136:7-12 [APP. 400]; *see also SEC v. Thompson*, 732 F.3d 1151, 1167 (10th Cir. 2013) (concluding that a note instrument was a security even though it contained disclaimer that it was "not offering a security" and that it was "not an investment program"). On their face, therefore, the Venture Agreements establish that investors relied on CryptoFX to perform crypto-asset and forex trading on their behalf.

The CryptoFX seminars further affirmed that investors relied on CryptoFX's expertise to obtain investment returns. The PowerPoint presentation used in at least some of CryptoFX's seminars shows that presenters told investors they would earn "passive" returns every three and six months. Ex. 3, Presentation, at CFX_020274, CFX_020277 [APP. 137, 140]. Furthermore, Defendants—including Sanchez—each admitted that CryptoFX gave presentations in which presenters solicited investors to invest in CryptoFX specifically and promised passive returns generated through the efforts of Chavez and CryptoFX's traders. Ex. 8, Sanchez Depo. 34:18-37:8, 45:7-46:4 [APP. 339-342, 346-347]; Ex. 1, Zavala Depo. 24:9-25:14, 38:11-17 [APP. 11-12, 22]; Ex. 4, Turcios

Depo. 21:15-27:13, 30:21-31:9, 53:25-55:5 [APP. 177-183, 185-186, 197-199]; Depo. Ex. 2, Saravia 3/12/25 Depo. 51:2-16, 54:1-14, 55:23-58:25 [APP. 98, 101-105]. Sanchez also admits that he posted in a group chat encouraging others to attend meetings about investing in CryptoFX, as opposed to crypto-assets in general. Ex. 8, Sanchez Depo. 47:22-48:9 [APP. 348-349]. He also admits that while CryptoFX provided information about crypto-assets, investors typically just invested directly in CryptoFX to get the promised returns. Ex. 8, Sanchez Depo. 44:13-18 [APP. 345]. And with regards to the seminar Sanchez personally directed, the transcript of the meeting and Sanchez's own deposition testimony confirm that the focus was on encouraging people to earn greater returns by signing up new investors for CryptoFX, *not* about educating people on how to gain wealth through their own independent crypto-asset investing. Ex. 18, Trans. [APP. 549-609]; Ex. 8, Sanchez Depo. 61:6-62:5, 68:4-73:9 [APP. 357-358, 364-369]. Contrary to Sanchez's arguments, therefore, the "primary pitch" of the seminars was not about teaching people how to earn money through crypto-asset markets in general, but in obtaining investment returns through the trading of CryptoFX. *See* Ex. 19, Portillo Decl. ¶¶ 2-5 [APP. 611]; Ex. 20, Llangari Decl. ¶¶ 2, 4 [APP. 614]; Ex. 25, Velez Decl. ¶¶ 2-4 [APP. 1336-1337]; Ex. 45, Puga Decl. ¶¶ 2-5 [APP. 2060] (declarations from investors, all of which indicate they were told they would earn returns by investing in CryptoFX). There is therefore no reasonable dispute of fact that a common enterprise existed.

### 2. Investors expected returns solely through the efforts of Chavez/CryptoFX.

Sanchez also argues that the Venture Agreements' language—when considered at the exclusion of all other evidence—prevented investors from forming a reasonable expectation of profit. Doc. 78, Resp. at 10-11. But, again, Sanchez's arguments do not make sense in the context of the Venture Agreements. The Venture Agreements state explicitly that CryptoFX (not investors) will be using the money to "invest" in crypto-assets and forex and that the company will pay investors returns based on the company's trading. *See, e.g.*, Ex. 41, Contracts [APP. 1738, 1740].

Beyond these facial problems, Sanchez's arguments that investors did not reasonably expect profits is undermined by the overwhelming record evidence of CryptoFX's solicitations to investors. Sanchez himself testified that the Venture Agreements were not just tuition receipts, but were "more like a timeline on how much you are going to get paid on interest and when you are going to get paid." Ex. 8, Sanchez Depo. 35:23-25 [APP. 340-341]. Indeed, the Venture Agreements included spaces to insert the dates for payment and the amount paid. *See, e.g.*, Ex. 41, Contracts [APP. 1738, 1740]. Each of the Defendants has similarly testified that investors were told that they would earn returns—typically around 15%—on their investments through Chavez's and CryptoFX's efforts. *See, e.g.*, Ex. 8, Sanchez Depo. 34:15-37:8 [APP. 339-342]; Ex. 1, Zavala Depo. 38:7-39:2 [APP. 22-23]; Ex. 2, Saravia 3/12/22 Depo. 55:23-57:25 [APP. 102-104]; Ex. 4, Turcios Depo. 30:21-31:9, 53:25-55:5 [APP. 185-186, 197-199]; *see also* Ex. 12, Trans. at 1-4 [APP. 531-534] (telling investors they would earn 15% returns

every six months on their investment). For his part, Sanchez offers no evidence to dispute that these representations were made. There is therefore no reasonable dispute of fact that investors were led to expect returns based solely on the efforts of CryptoFX and its representatives.[1]

In short, Sanchez's attempts to paint CryptoFX as a benign symposium on crypto-asset markets are at odds with the undisputed evidence showing the Venture Agreements were investment contracts, and thus securities, under *Howey*. Sanchez's actions violated the federal securities laws and the SEC's Motion should be granted. *See SEC v. Silea*, No. 4:20-CV-737-SDJ, 2022 WL 269105, at *9 (E.D. Tex. Jan. 27, 2022) (finding sales of membership interests in purported fund constituted sales of securities).

**B.    The evidence establishes that Sanchez committed fraud.**

To make out a claim for securities fraud based on fraudulent misrepresentations or omissions, the SEC must show: (a) a misrepresentation or omission of a fact; (b) that is material; (c) that is made in connection with the purchase, offer, or sale of a security; (d) with the requisite mental state; and (e) using means or instrumentalities of interstate commerce. *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009). Similarly, to establish liability based on a fraudulent scheme, the SEC must show "the employment of any device, scheme, or artifice to defraud; and the engaging in any act, practice, or course of

---

[1] Moreover, the Fifth Circuit in *SEC v. Koscot Interplanetary, Inc.* long ago held that the word "solely" in *Howey* was not to be construed literally, but instead the critical inquiry is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." 497 F.2d 473, 483 (5th Cir. 1974).

business that operates or would operate as a fraud or deceit" in the offer or sale, or in connection with the purchase or sale, of securities. *SEC v. Narayan*, No. 3:16-CV-1417-M, 2017 WL 4652063, at *3 (N.D. Tex. Aug. 28, 2017); 17 C.F.R. § 240.10b-5; 15 U.S.C. §§ 77q(a)(1) & (3). Proof of scienter is required for violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, while violations of Sections 17(a)(2) and 17(a)(3) only require a showing of negligence. *Aaron*, 446 U.S. 680, 696-97 (1980).

In its Motion, the SEC establishes that Sanchez made at least five different material misrepresentations or omissions to investors. Doc. 65, Mot. at 32-33. The SEC similarly establishes that Sanchez participated in a fraudulent scheme. *Id.* at 39-41. In his response, Sanchez only contests (1) that he made one of the misrepresentations to investors (i.e., whether he told investors that he made $11 million from crypto-assets) and (2) whether he acted with scienter. Doc. 78, Resp. at 14.[2] He otherwise does not address—and therefore waives—any arguments regarding the other misstatements and omissions he made or his participation in CryptoFX's fraudulent scheme. *Kitchen*, 952 F.3d at 253. Summary judgment is therefore appropriate as to these misrepresentations, omissions, and acts of fraud.

---

[2] Sanchez also contends that he did not create digital wallets for investors in order to perpetrate a fraud. Doc. 78, Resp. at 4. He does not contest that he assisted investors in creating wallets, however, only that he did not have the requisite intent. This argument therefore goes to his scienter, addressed below.

### 1. Sanchez represented to investors that he had made $11 million.

As for the sole misrepresentation he does contest, the evidence shows that Sanchez represented to investors in a seminar that he was a crypto expert who had earned $11 million in between 2017 and 2018 through crypto-assets. Ex. 18, Trans., at 21 [APP. 569]. Sanchez now argues that he "attempted" to say that he had made $11 million in crypto-asset gains over time and that those gains were offset by losses. Doc. 78, Resp. at 14. But the transcript of the seminar speaks for itself:

> And I've made some good numbers there too. Wow. Sorry, he stayed. Well, and…how much have I made in 2018 so far? I've made money, so much, that you can sleep on top of it. I don't like to say it, well, but today we're saying our trajectories and I'm here in cryptoeconomics, a little bit over $11 million.

Ex. 18, Trans. at 21 [APP. 569]. Sanchez made this claim in order to bolster his own image as a self-proclaimed crypto "expert." *Id.* The seminar's main focus was to encourage investors to continue bringing in new investors and gaining commissions. *Id.* at 1-61 [APP. 549-609]. He therefore had every incentive to paint himself as a successful crypto expert, and his claimed "intent" in making these statements is not supported by the plain text of the seminar's transcript.

### 2. Sanchez acted with scienter.

Scienter is established by showing Sanchez acted intentionally or with severe recklessness. *SEC v. Seghers*, 298 F. App'x 319, 333 (5th Cir. 2008). Severe recklessness includes "highly unreasonable omissions or misrepresentations that constitute an extreme departure from the standards of ordinary care" and "present a danger of misleading buyers or sellers that the defendant either knows exists, or is so obvious a danger that he

must have been aware of it." *SEC v. Provident Royalties, LLC*, No. 3:09-CV-01238-L, 2013 WL 5314354, at *5 (N.D. Tex. Sept. 23, 2013).

The evidence that Sanchez knew, or at least was severely reckless in not knowing, that CryptoFX was a fraud is overwhelming. Sanchez admits he knowingly used new investor funds to pay commissions and returns to earlier investors. Ex. 8, Sanchez Depo. 103:2-104:5, 114:25-118:17 [APP. 379-380, 388-392]. He coordinated and oversaw the collection and payment of investor funds, and the spreadsheet he maintained to track payments to and from investors shows he was bringing in and paying out more than $5 million *per month* in multiple separate months—well above the purported $14 million that Chavez claimed to have in some accounts in 2020. *Id.* at 104:5-19, 111:4-17, 112:9-113:12, 121:14-122:4 [APP. 380, 385-387, 394-395]; Ex. 32, Sanchez Spreadsheet, at SANCHEZ 000001, 30, 88, 117, 187 [APP. 1383, 1412, 1470, 1499, 1569]. Sanchez also had motive to monitor the volume of contracts and payments he was making because he had brokered a deal with Chavez to receive a percentage of the "volume" of new contracts. Ex. 8, Sanchez Depo. 66:20-67:24, 101:9-102:1 [APP. 362-363, 377-378]. Even though he participated in the scheme for well over two years and made millions of dollars of payments sourced from investor funds, between 2020 and March 2022, he did not inquire about CryptoFX's returns. *Id.* at 28:1-30:25 [APP. 335-337]. And then, when Sanchez did ask for information about CryptoFX's earnings and Chavez did not provide it, Sanchez did not stop collecting or paying out investor funds but continued to collect and pay out millions in Ponzi payments. Ex. 32, Sanchez Spreadsheet, at SANCHEZ 000001 – 254 [APP. 1383 -1636] (showing new contracts entered after March 2022); *see*

*also* Ex. 8, Sanchez Depo. 118:18-119:6, 135:22-136:12 [APP. 392-393, 399-400] (testifying that he asked Houston for extra funds to cover deficit in 2020, but CryptoFX instead directed him to perform promotions to bring in new investors). In fact, he continued to knowingly use new investor funds to pay earlier investors **even after** he learned that the SEC had sued CryptoFX, alleging the company was a Ponzi scheme. Ex. 25, Velez Decl. ¶¶ 5-7 [APP. 1336-1337]. Sanchez also simply elides over the evidence that **he misappropriated funds to pay for his own home**, showing that he not only participated but knowingly took advantage of the CryptoFX fraud for his own personal gain. *See* Doc. 65, Mot. at 17-18. The undisputed evidence therefore shows that Sanchez knew about, or at a minimum was severely reckless in turning a blind eye to, the fraud.

Sanchez now contends that there is no evidence that he knew CryptoFX was a Ponzi scheme or that investor funds were not being invested. Doc. 78, Resp. at 14. He points to no evidence to support this argument, however, beyond contending that Chavez misled him and that he trusted Chavez. *Id.* at 14-15. But, as noted above, the evidence presented in the SEC's Motion establishes that Sanchez continued to work for CryptoFX and collect investments, even when he knew that CryptoFX did not have funds to cover payments and even after the SEC had filed its litigation charging CryptoFX with being a fraud. Sanchez knew, or at a minimum was severely reckless in ignoring, that CryptoFX was engaged in a fraudulent scheme, and the SEC's Motion should be granted.

## CONCLUSION

Sanchez may try to label CryptoFX as an "academy" where investors congregated to learn about crypto-assets. But no matter what it is called, CryptoFX offered securities

and was, in fact, a fraudulent investment scheme.  The SEC's Motion should be granted and Sanchez should be held liable for each of the SEC's claims.

Dated: August 5, 2025

Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

<u>/s/ Tyson M. Lies</u>
Matthew J. Gulde
Illinois Bar No. 6272325
S.D. Texas Bar No. 1821299
Tyson M. Lies
Texas Bar No. 24087927
S.D. Texas Bar No. 3865116
Jillian Harris
Texas Bar No. 24087671
S.D. Texas Bar No. 2669497
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1410
Facsimile:  (817) 978-4927
guldem@sec.gov
liest@sec.gov
harrisji@sec.gov

*Attorneys for Plaintiff*

# CERTIFICATE OF CONFERENCE

I affirm that on August 4 and 5, 2025, I communicated with counsel for Defendants regarding the SEC's Motion to Supplement.  Counsel for each defendant advised that his or her clients do not oppose the relief requested in this Motion.

<u>/s/Tyson M. Lies</u>
Tyson M. Lies

# CERTIFICATE OF SERVICE

       I affirm that on August 5, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court for the Southern District of Texas, Houston Division, by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

                                          */s/Tyson M. Lies*
                                          Tyson M. Lies