United States District Court
Southern District of Texas
**ENTERED**
January 30, 2026
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ISMAEL ZARCO SANCHEZ, | ) |
| GABRIEL ARGUELLES, | ) |
| HECTOR AQUINO, | ) |
| GLORIA CASTANEDA, | ) |
| ORLIN WILIFREDO TURCIOS CASTRO, | ) |
| CARMEN DE LA CRUZ, | ) |
| ELIZABETH ESCOTO, | ) Civil Action No 4:24-cv-939 |
| REYNA GUIFFARO, | ) |
| MARCO ANTONIO LEMUS, | ) |
| DULCE OCHOA, | ) |
| GABRIEL OCHOA, | ) |
| JUAN PUAC, | ) |
| MARIA SARAVIA, | ) |
| LUIS SERRANO, | ) |
| JULIO TAFFINDER, | ) |
| CLAUDIA VELAZQUEZ, and | ) |
| ROBERTO ZAVALA, | ) |
| | ) |
| Defendants. | ) |

## ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL JUDGMENT BY DEFAULT AGAINST DEFENDANTS GABRIEL ARGUELLES, HECTOR AQUINO, GLORIA CASTANEDA, CARMEN DE LA CRUZ, DULCE OCHOA, GABRIEL OCHOA, JUAN PUAC, AND CLAUDIA VELAZQUEZ

This matter came before the Court on Plaintiff Securities and Exchange

Commission's ("SEC") Motion for Final Judgment by Default against Defendants

Gabriel Arguelles, Hector Aquino, Gloria Castaneda, Carmen de la Cruz, Dulce Ochoa,

Gabriel Ochoa, Juan Puac, and Claudia Valezquez.  Having considered the SEC's Motion and the record in this case, the Court has concluded that the SEC's Motion should be, and hereby is, **GRANTED**.  By separate document, the Court will issue Final Judgments by Default against each of the Defendants.  In granting the SEC's Motion, the Court makes the following specific findings of fact and conclusions of law relating to the relief requested:

## FINDINGS OF FACT

1.    On March 14, 2024, the SEC filed its Complaint against Defendants, seeking injunctive and monetary relief.  Doc. 1.

2.    Defendants were served with process on the dates listed below:

| Defendant | Date Served |
|---|---|
| Gabriel Arguelles | 4/16/2024 |
| Hector Aquino | 4/18/2024 |
| Gloria Castaneda | 4/04/2024 |
| Carmen De La Cruz | 4/03/2024 |
| Dulce Ochoa | 3/23/2024 |
| Gabriel Ochoa | 3/23/2024 |
| Juan Puac | 7/25/2024 |
| Claudia Velazquez | 3/24/2024 |

3.    None of the Defendants has filed or served an answer, other responsive pleading, or otherwise defended himself/herself in this action.

4.    None of the defendants is a minor, an incompetent person, or an active military service member eligible for relief under the Servicemembers Civil Relief Act of 2003.  *See* 50 U.S.C. Appendix § 501 et seq.

5.  On June 12, 2025, the SEC filed an application for the District Clerk to enter default against Defendants.  Doc.  62.  On January 12, 2026, the Clerk entered default against each of the Defendants.

6.  As a result of the entry of default, the allegations in the SEC's Complaint are deemed admitted.  As such, the allegations in the SEC's Complaint are incorporated herein by reference.

7.  Between May 2020 and September 2022, CryptoFX, LLC ("CryptoFX"), a Texas limited-liability company, conducted a Ponzi scheme targeting Latino investors in which it raised more than $300 million from over 40,000 investors.  Doc. 1, Complaint, ¶¶ 1, 32.

8.  As part of the scheme, CryptoFX offered and sold investment contracts, called "Venture Agreements," to investors.  *Id.* ¶¶ 29, 38.

9.  CryptoFX and its representatives claimed that its founder, Mauricio Chavez, would use investor funds to perform crypto-asset and foreign-exchange trading to obtain guaranteed, periodic returns for investors ranging from 15% to 100%.  *Id.* ¶¶ 29, 33.

10.  In reality, CryptoFX used the money to make Ponzi payments, pay commissions to salespeople in a multi-level marketing scheme, and for personal purchases by CryptoFX executives and others, including some Defendants.  *Id.* ¶¶ 3, 33.

11.    On September 19, 2022, the Commission filed an emergency action against CryptoFX, Chavez, and a CryptoFX insider, Giorgio Benvenuto, charging each with violating the antifraud and registration provisions of the federal securities laws.  *Id.* ¶¶ 2, 34; *see* Complaint, *SEC v. Mauricio Chavez et al.*, 4:22-cv-3359 (S.D. Tex. Sept. 19, 2022), ECF No. 1.

12.    The Court granted a temporary restraining order and, later, a preliminary injunction that halted CrypoFX's ongoing fraudulent offering and ordered an asset freeze, among other relief, and also placed CryptoFX's, Chavez's, and Benvenuto's assets into receivership.  Doc. 1, Compl. ¶ 34.

13.    Defendants were salespeople in the CryptoFX organization (identified by CryptoFX and the Complaint as "Leaders").  *Id.* ¶¶ 3, 37.

14.    CryptoFX Leaders were responsible for (1) soliciting new investors; (2) managing ongoing recruitment and referrals by other investors; (3) communicating bonuses and promotions; (4) documenting new investments; (5) collecting investor funds; (6) sending some cash to CryptoFX's Houston headquarters; and (7) paying out purported investor returns.  *Id.* ¶ 36.

15.    Defendants offered and sold CryptoFX's investment contracts to, collectively, thousands of investors across the United States, including in Houston, Chicago, and Los Angeles.  *Id.* ¶ 40.

16.    Each of the Defendants routinely used means of interstate commerce, including cell phones and the Internet, to promote CryptoFX to prospective investors.  *Id.* ¶¶ 37, 40.

17.    Defendants promised investors that they would make returns ranging from 15% to 100% generated by CryptoFX's crypto-asset and foreign-exchange trading program.  *Id.* ¶¶ 37, 40.

18.    Several of the Defendants also pitched prospective investors at seminars in which the Defendants touted CryptoFX as the road to financial freedom, claimed that it had created multiple millionaires and, in some cases, even told prospective investors that the investments were "risk-free" and that their principal was guaranteed even if there was a world war or power outage.  *Id.* ¶¶ 37, 40.

19.    After soliciting new investors, each Defendant instructed the investors to execute a Venture Agreement, which identified investment amounts, the promised returns, and the dates that the returns would be paid.  *Id.* ¶ 38.

20.    Investors typically made cash investments ranging from $500 to $300,000.  *Id.*

21.    Defendants earned transaction-based compensation in the form of commissions and bonuses based on the amounts that investors invested.  *Id.* ¶¶ 39-40.

22.    Defendants' transaction-based earnings included 7% of the investments of all investors they personally brought in as "first-tier" investors; 3% of all funds solicited

5

by first-tier investors; and an extra bonus when three of their referrals invested a certain amount set by Chavez. *Id.* ¶ 39.

23.    Defendants solicited investments in CryptoFX, including the following:

(a) In the summer of 2022, **Defendant Gabriel Arguelles** told P.R. and her husband during a meeting in Mundelein, Illinois that: (i) they could earn 18% returns after six months by investing in CryptoFX, (ii) there was "no risk" investing, and (iii) their "money was guaranteed." As a result, P.R. gave Arguelles $5,000 in cash. Records indicate that Arguelles received at least $55,843 in commissions and bonuses from sales of CryptoFX contracts and purported investment returns. *Id.* ¶ 40.b.

(b) In the summer of 2022, **Defendant Hector Aquino** solicited investor G.M. at a regularly-held CryptoFX solicitation meeting in Los Angeles. During the meeting, Aquino described his success with CryptoFX and promised 15% returns. As a result, G.M. gave Aquino $5,000 in cash. Records indicate that Aquino received at least $55,169 in commissions and bonuses from sales of CryptoFX contracts and purported investment returns. *Id.* ¶ 40.c.

(c) On or around May 24, 2022, **Defendant Gloria Castaneda** promised M.V. that she would earn 18% returns in six months by investing in CryptoFX. Consequently, M.V. took out a $20,000 loan and gave Castaneda two separate $10,000 cash investments. Records indicate that Castaneda received at least $548,865.90 in commissions and bonuses from sales of CryptoFX contracts. *Id.* ¶ 40.d.

(d) In May 2022, **Defendant Carmen De la Cruz** solicited M.M. to invest $5,000 in CryptoFX, telling her that she would receive 15% returns every three months. De la Cruz filled out M.M.'s Venture Agreement and accepted her $5,000 cash investment. Records indicate that De la Cruz received at least $45,073 in commissions and bonuses from sales of CryptoFX contracts and purported investment returns. *Id.* ¶ 40.f.

(e) During a summer 2022 Zoom meeting, **Defendant Dulce Ochoa** promised investor I.M. that she would receive 18% returns after six months by investing in CryptoFX. Dulce Ochoa guaranteed that she would return I.M.'s entire investment principal, no matter what happened. Based on these representations, I.M. and her two brothers invested $52,500. Dulce Ochoa received at least $16,560 in commissions and bonuses from sales of CryptoFX contracts and purported investment returns. *Id.* ¶ 40.j.

(f) In April 2022, **Defendant Gabriel Ochoa** gave a presentation to investor J.B. and other potential investors, assuring them that their capital would not be at any risk if there was a war or power outage. Further, Gabriel Ochoa led numerous in-person presentations promising 18% returns after six months based on Chavez's trading. The Ochoas operated the CryptoFX office in Waukegan, Illinois where these presentations were held. Records indicate that Gabriel Ochoa received at least $473,401.52 in commissions and bonuses from sales of CryptoFX contracts and purported investment returns. *Id.* ¶ 40.k.

(g) In April 2022, **Defendant Juan Puac** pitched investor B.R. about the CryptoFX "investing programs"—Bronze, Silver, and Gold—each with different minimum investment amounts. After Puac told B.R. that he would receive 15% returns every three months, B.R. invested $11,000 in cash. Records indicate that Puac received at least $164,846 in commissions and bonuses from sales of CryptoFX contracts and purported investment returns. *Id.* ¶ 40.l.

(h) In August 2022, **Defendant Claudia Velazquez** pitched investments in CryptoFX to investor S.Q., telling her that she would receive 30% returns every three months for a year on a $10,000 investment. Records indicate that Velazquez received at least $53,585 in commissions and bonuses from sales of CryptoFX contracts and purported investment returns. *Id.* ¶ 40.p.

24.    None of the investments offered by Defendants were registered with the Securities and Exchange Commission. *Id.* ¶ 42.

25.    No Defendant was ever registered with the Commission as a broker or dealer or was an associated person of a firm registered with the Commission. *Id.*

26.    Defendants Gabriel Ochoa, Dulce Ochoa, and Gloria Castaneda also defrauded CryptoFX investors by (1) soliciting investors after the Court entered emergency orders to halt CryptoFX's ongoing offering; (2) making Ponzi payments to investors, and/or (3) taking actions to conceal the fraud from investors. *Id.* ¶ 43.

27.    After the Commission sued CryptoFX on September 19, 2022, the Ochoas told investors—on or about October 1, 2022—via text and WhatsApp messages that their CryptoFX office would be closed for an "adaptation program." *Id.* ¶ 47.

28.    Then, on October 15, 2022, the Ochoas announced that CryptoFX was going to enact this "adaptation program" with new contracts to be paid with bitcoin via digital wallets. *Id.*

29.    The Ochoas later admitted in a December 2022 Facebook video that they learned about the SEC's lawsuit in early October 2022, shortly after the temporary restraining order, asset freeze, and receivership were in place. *Id.*

30.    More than a month after the SEC filed its lawsuit against CryptoFX, the Ochoas told investors that they would double their money after six months through Chavez's crypto-asset trading, even though they knew that: (a) CryptoFX was in

receivership and subject to an asset freeze and a preliminary injunction; and (b) Chavez was restrained and enjoined from engaging in such activity. *Id.* ¶ 48.

31.     On or about October 21, 2022, the Ochoas visited investor E.M. in North Carolina and told E.M. that CryptoFX would double her investment in six months. *Id.*

32.     As a result, E.M. signed a Venture Agreement and gave the Ochoas $5,000 in cash to invest with CryptoFX. *Id.*

33.     The Ochoas therefore knew that CryptoFX was alleged to be a fraudulent entity and had been placed into receivership with its assets frozen, yet continued to solicit investors up to and as late as October 21, 2022. *Id.* ¶¶ 46-48.

34.     Neither Gabriel nor Dulce Ochoa ever informed E.M. that CryptoFX had been sued by the SEC more than a month earlier, was in receivership, was subject to a preliminary injunction and an asset freeze, or that it operated as an alleged Ponzi scheme. *Id.* ¶ 49.

35.     In mid-to-late October 2022, the Ochoas and other Leaders solicited prospective investors via Zoom meetings, WhatsApp messages, and text messages to invest in a purportedly new entity called "24/7 Academy," which – just like CryptoFX – would provide returns from trading in crypto assets. *Id.* ¶ 56.

36.     The Ochoas told investors that an additional investment of at least $1,000 in 24/7 Academy would ensure they would receive their promised CryptoFX returns. *Id.*

37.    24/7 Academy did not have any actual operations and was apparently created to solicit a new influx of funds to keep the CryptoFX scheme going.  *Id.*

38.    Castaneda personally handled incoming and outgoing cash for CryptoFX such that she knew, or was severely reckless in not knowing, that CryptoFX operated as a Ponzi scheme.  *Id.* ¶ 50.

39.    Between January 2022 and September 2022, Castaneda received $11,647,557 in investments from investors.  *Id.* ¶ 53.

40.    Of these funds, Castaneda only sent $921,244 (less than 8%) to Houston for Chavez to purportedly "trade."  *Id.*

41.    Castaneda used $8,589,227 to pay purported returns to earlier investors and paid the remainder as commissions and bonuses to herself and those in her referral group. *Id.*

42.    Castaneda and the Ochoas lied about investment-return payment dates, telling investors that their returns would be paid in full in November 2022, and then moving the date to December 2022.  *Id.* ¶ 55.

43.    In or around May 2023, Gabriel Ochoa told two investors in Zion, Illinois that he would help them obtain the return of their CryptoFX investment money if they took back everything they had said to the SEC and other law enforcement authorities.  *Id.* ¶ 57.

10

## CONCLUSIONS OF LAW

**A. The Venture Agreements were securities.**

44.    The Venture Agreements are "investment contracts," and thus "securities" under Section 2(a)(1) of the Securities Act of 1933 ("Securities Act") and Section 3(a)(10) of the Securities Exchange Act of 1934 ("Exchange Act").  Investors invested money, in a common enterprise, with a reasonable expectation of profits derived solely from the entrepreneurial or managerial efforts of others.  *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-301 (1946).  Specifically, investors invested their money, which was pooled by CryptoFX, expecting to obtain returns based on the purported efforts and expertise of Chavez and CryptoFX to perform crypto-asset and foreign-exchange trading and obtain guaranteed returns.

**B. Defendants violated Sections 5(a) and (c) of the Securities Act.**

45.    Section 5 of the Securities Act prohibits the unregistered offer or sale of securities in interstate commerce unless an exemption from registration applies.  17 U.S.C. § 77e; *SEC v. Continental Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972). Because Section 5 is a strict liability statute, a defendant's intent is irrelevant.  *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980).

46.    The offerings and sales of the Venture Agreements were never registered with the SEC, and no exemption from registration has been shown to apply.  Doc. 1, Compl. ¶ 42.

11

47.    Defendants used instruments and means of communication and transportation in interstate commerce, including the Internet and cell-phone communications, among other means, to find, communicate, offer, and sell the Venture Agreements to potential investors.  *Id.* ¶¶ 30, 37, 40-42, 48, 53, 56.

48.    Defendants therefore violated Sections 5(a) and 5(c) of the Securities Act by offering and selling securities to investors without registering those offerings and sales of securities with the Commission.

## C. Defendants violated Section 15(a) of the Exchange Act.

49.    Section 15(a) of the Exchange Act makes it unlawful for any "broker or dealer" to "make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security [. . .] unless such broker or dealer is registered in accordance" with the section. 15 U.S.C. § 78o(a)(1).  Scienter is not an element of Section 15(a).  *SEC v. Offill*, No. 3:07-CV-1643-D, 2012 WL 246061, at *6–7 (N.D. Tex. Jan. 26, 2012).  A broker is "any person engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78c(a)(4)(A).

50.    Defendants were not registered with the SEC as brokers or dealers or associated with a registered broker or dealer.  Doc. 1, Compl. ¶ 42.

51.    Defendants each similarly effected, induced, or attempted to induce the purchase or sale of securities using means of interstate communication and transportation

by soliciting investors via the Internet, Zoom meetings, text messages, and telecommunications. *Id.* ¶¶ 30, 37, 40-42, 48, 53, 56.

52.    Defendants acted as brokers within the meaning of Section 15(a) by (1) soliciting investors to purchase securities in the form of the Venture Agreements, (2) negotiating the appropriate investment amounts with investors, (3) advising investors about the merits of the investment, (4) preparing paperwork on behalf of investors, and (5) receiving transaction-based compensation in the forms of commissions and bonuses. *Id.* ¶¶ 37, 39, 40-42, 48, 56.

53.    Defendants therefore effected transactions in securities without registering with the Commission and acted as unregistered brokers in violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o].

**D.  Defendants Dulce Ochoa, Gabriel Ochoa, and Gloria Castaneda violated Section 10(b) of the Exchange Act, Rule 10b-5 Thereunder, and Section 17(a) of the Securities Act.**

54.    Section 10(b) and Rules 10b-5 thereunder make it unlawful to use any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

       (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5; *see also* 15 U.S.C. § 78j(b).

55.    Violations of Section 17(a) similarly make it unlawful in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

       (a) to employ any device, scheme, or artifice to defraud, or

       (b) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

       (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

56.    Proof of scienter is required for Rules 10b-5 and Section 17(a)(1), but a showing of negligence is sufficient for Sections 17(a)(2) and (3). *Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980); *Meadows v. SEC*, 119 F.3d 1219, 1226 n.15 (5th Cir. 1997).

57.    Defendants Gabriel Ochoa, Dulce Ochoa, and Castaneda made untrue statements of material fact and engaged in a scheme to defraud investors.

58.    Gabriel and Dulce Ochoa misled investors by telling investors that their office had closed and touting a new adaptation program, all while CryptoFX and its

founders had been sued and placed in receivership.  The Ochoas continued to solicit investors after CryptoFX had been placed into receivership, and they and others solicited investors for another venture entitled 24/7 Academy, a venture that promised to obtain returns through crypto-asset trading but did not have operations or actually exist.  The Ochoas likewise falsely promised that investments in 24/7 Academy would secure investors' investments in CryptoFX, when they in fact would not.  The Ochoas also lied about investment-return payment dates, telling investors that their returns would be paid in full in November 2022, and then moving the date to December 2022.

59.     Castaneda personally handled incoming and outgoing cash for CryptoFX. Instead of forwarding investor funds to be used for trading in crypto-asset and foreign-exchange markets as represented, she used over $8 million in investor funds to pay returns to earlier investors or to pay commissions and bonuses.  Castaneda also also lied about investment-return payment dates, telling investors that their returns would be paid in full in November 2022, and then moving the date to December 2022.

60.     Each of these Defendants acted knowingly, or at a minimum with severe recklessness, and with the intent to deceive, manipulate, and defraud.

61.     As a result of their misconduct, Defendants Gabriel Ochoa, Dulce Ochoa, and Gloria Castaneda violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### E. Defendant Gabriel Ochoa violated Exchange Act Rule 21F-17(a).

62.     Exchange Act Rule 21F-17(a) makes it unlawful for any person to "take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation[.]"  17 C.F.R. § 240.21F-17(a).

63.     In May 2023, Defendant Gabriel Ochoa told two CryptoFX investors that he would obtain the promised returns on their investments if the investors withdrew their statements to the Commission staff.   In doing so, he deliberately attempted to impede investors from communicating with the Commission about securities laws violations and thus violated Rule 21F-17(a).

### F. Injunctive Relief

64.     The Securities Act [15 U.S.C. § 77t(b)] and the Exchange Act [15 U.S.C. § 78u(d)] authorize the SEC to seek injunctive relief against anyone who is engaged or is about to engage in conduct that violates these Acts.

65.     To obtain a permanent injunction against future violations of the securities laws, the SEC must demonstrate that: (1) the SEC has actually succeeded on the merits, (2) irreparable harm will likely result in the absence of the injunction, (3) the balance of the equities tips in the SEC's favor, and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008); *see also Starbucks v. McKinney*, 144 S. Ct. 1570, 1576 (2024).

66.    Because the Court must assume a defendant admits the Complaint's well-pleaded facts upon default, the SEC has succeeded on the merits.  Therefore, the first *Winter* factor is established.

67.    The second *Winter* factor is also established because the SEC has shown irreparable harm will likely result in the absence of the injunction.  To obtain an injunction against further securities law violations, the SEC must show a "likelihood of recurrence" (*SEC v. Gentile*, 939 F.3d 549, 555-58 (3d Cir. 2019)), and such "cognizable risk of future harm" satisfies the "irreparable harm requirement."  *SEC v. Chappell*, 107 F.4th 114, 128-29 (3d Cir. 2024) (discussing *Gentile*).  District courts granting injunctions under the four-part test also have recognized that the government's showing of a likelihood of future violations satisfies the irreparable harm requirement.  *See, e.g.*, *FTC v. Your Yellow Pages, Inc.*, No. 14-CV-22129, 2014 WL 12537140, at *1 (S.D. Fla. July 1, 2014) ("There is good cause to believe that immediate and irreparable harm will result from continued violations by [defendant] of the FTC Act unless he is restrained and enjoined."); *FTC v. Silueta Distributors, Inc.*, No. 93-cv-4141, 1994 WL 387881, at *1-*2 (N.D. Cal. July 11, 1994).

68.    In determining whether there is a reasonable likelihood of future violations, courts consider the following factors:

    (1)    the egregiousness of the defendant's conduct;
    (2)    the isolated or recurrent nature of the violation;
    (3)    the degree of scienter;
    (4)    the sincerity of defendant's recognition of his transgression; and
    (5)    the likelihood of the defendant's job providing opportunities for future violations.

*SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981); *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009); *SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978). The existence of past violations of federal securities laws may give rise to an inference that there will be future violations and the fact that a defendant is currently complying with the securities laws does not preclude an injunction. *Blatt*, 583 F.2d at 1335; *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).

69.     The circumstances here weigh in favor of permanent injunctions. Defendants' conduct was highly egregious. Defendants each earned significant gains while promoting a scheme that defrauded investors of millions of dollars. Defendants promised returns and touted the safety of investing with CryptoFX when they had no basis for doing so. Defendants' misconduct was continuous for multiple years and was recurring. Defendants have all failed to recognize their transgressions, and their respective occupations and means readily available to them provide opportunities for future violations. Defendants Gabriel Ochoa, Dulce Ochoa, and Gloria Castaneda also acted with a high degree of scienter. Thus, irreparable harm is likely to result if Defendants are not enjoined.

70.     The third *Winter* factor is also satisfied. The equities in this case balance in favor of permanent injunctive relief requested by the SEC. The reasonable likelihood of Defendants' future violations and misconduct in connection with unregistered stock offerings give rise to a strong interest in protecting investors. That interest heavily

outweighs any interest or burden that might be imposed on Defendants as a result of the injunctive relief requested.

71.     The fourth *Winter* factor is also satisfied.  The public interest favors the imposition of the injunctive relief requested by the SEC.  There is a public interest in enforcing the antifraud provisions of the federal securities laws and imposing the statutory remedies provided by Congress in light of Defendants' violations and the other facts and circumstances of this case.

72.     Based on the foregoing analysis of the *Winter* factors and the applicable law, the Court finds that permanent injunctions enjoining Defendants from violating the provisions of the Acts at issue are warranted.

73.     The Court also finds that, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], more specific, permanent injunctions are also warranted against Defendants Gabriel Ochoa, Dulce Ochoa, and Gloria Castaneda.  Under Section 21(d)(5) of the Exchange Act, the Court is authorized to "grant any equitable relief that may be appropriate or necessary for the benefit of investors."  Based on an analysis of the foregoing *Winter* factors, the applicable law, and its findings of fact above, the Court finds that permanent injunctions are warranted against Defendants Gabriel Ochoa, Dulce Ochoa, and Gloria Castaneda, enjoining them from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him or her, participating in the issuance, purchase, offer, or sale of any securities; provided however that such injunction

shall not prevent him or her from purchasing or selling securities for his or her own personal account. *SEC v. Voight*, No. CV H-15-2218, 2021 WL 5181062, at *14 (S.D. Tex. June 28, 2021) (noting that such an injunction is "specifically authorized: in 15 U.S.C. §§ 77t(b) and 78u(d)(1)" of the Securities and Exchange Acts); *see also SEC v. Faulkner,* No. 3:16-CV-1735-D, 2021 WL 75551, *14-16 (N.D. Tex Jan. 8, 2021) (ordering conduct-based injunction similar to one requested here); *SEC v. Sneed*, No. 3:20-CV-2988-S-BH, 2021 WL 4202171, at *9–10 (N.D. Tex. Sept. 10, 2021) (same); *SEC v. AmeraTex Energy, Inc.*, No. 4:18-CV-00129, 2021 WL 1061395, at *5 (E.D. Tex. Mar 18, 2021) (same).

### G. Monetary Remedies

74.     The SEC is authorized to seek, and the Court is authorized to order, disgorgement of a defendant's ill-gotten gains causally connected to the defendant's securities law violations. *See* 15 U.S.C. 78u(d)(3), (d)(5), (d)(7); *Liu v. SEC*, 591 U.S. 71 (2020); *SEC v. Hallam*, 42 F.4th 316, 341 (5th Cir. 2022).

75.     "[T]he SEC has the burden reasonably to approximate the defendant's 'unjust enrichment' attributable to the securities violation." *Hallam*, 42 F.4th at 341 (citing *Blatt*, 583 F.2d at 1335); *see also SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021). Once the SEC establishes a reasonable approximation of the defendant's ill-gotten gains, the burden shifts to the defendant, who "must prove that the requested amount is 'unreasonable.'" *Hallam*, 42 F.4th at 341.

76.     Any risk of uncertainty in calculating the disgorgement amount falls on the wrongdoer whose illegal conduct created the uncertainty. *Voight*, 2021 WL 5181062, at *7 (quoting *First City Fin'l Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)); *see also SEC v. Harris*, No. 3:09-CV-1809-B, 2012 WL 759885, at *4 (N.D. Tex. Mar. 7, 2012) (citing *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995)). "[D]oubts are to be resolved against the defrauding party." *SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983).

77.     The district court has broad discretion in calculating the amount to be disgorged. *See, e.g.*, *SEC v. Helms, et al.*, No. A-13-CV-01036-ML, 2015 WL 5010298, *19 (W.D. Tex. Aug. 21, 2015) (citing *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993)).

78.     An order for disgorgement against Defendants is proper because Defendants violated the federal securities laws. *See SEC v. Reynolds*, No. 3:08-CV-0438-B, 2013 WL 3479825, at *3 (N.D. Tex. July 11, 2013) (ordering disgorgement based on violations of Sections 5(a) and (c) of the Securities Act).

79.     The IRS underpayment of federal income tax rate as set forth in 26 U.S.C. § 6621(a)(2) is appropriate for calculating prejudgment interest in SEC enforcement actions.

80.     Defendants received the amounts listed below during the Relevant Period.

| Defendant | Disgorgement Amount |
|---|---|
| Gabriel Arguelles | $55,843.00 |
| Hector Aquino | $55,169.00 |
| Gloria Castaneda | $548,865.90 |
| Carmen De La Cruz | $45,073.00 |

| Dulce Ochoa | $16,560.00 |
| Gabriel Ochoa | $473,401.52 |
| Juan Puac | $164,846.00 |
| Claudia Velazquez | $53,585.00 |

81.    These amounts represent reasonable approximations of Defendants' ill-gotten net profits.  Each amount is a reasonable approximation of the proceeds received by each of the Defendants from the fraud scheme based on internal CryptoFX records.  There is no evidence in the record that any of these funds were used for legitimate business expenses or returned to investors.

82.    Courts may add prejudgment interest to a disgorgement amount to prevent defendants from benefitting from the use of ill-gotten gains interest-free.  *SEC v. Gunn*, No. 3:08-CV-1013, 2010 WL 3359465, at *2 (N.D. Tex. Aug. 25, 2010).  Prejudgment interest is a matter left to the district court's discretion.  *SEC v. United Energy Partners, Inc.*, 88 F. App'x 744, 747 (5th Cir. 2004) (per curiam), *cert. denied sub nom., Quinn v. SEC*, 543 U.S. 1034 (2004).  The IRS underpayment of federal income tax rate is often used for calculating prejudgment interest on disgorgement in SEC enforcement actions.  *See, e.g.*, *Helms*, 2015 WL 5010298, at *19.

83.    It is appropriate to order Defendants to pay prejudgment interest because they enjoyed the benefit of ill-gotten funds obtained from investors interest-free, offending basic principles of justice and equity.  *See SEC v. Hughes Cap. Corp.*, 917 F. Supp. 1080, 1090 (D.N.J. 1996) (ordering prejudgment interest comports with

fundamental notions of fairness because defendants had benefit of nearly $2 million for nine years).

84.    Based on the disgorgement amounts above, application of the tax underpayment rate from the date the SEC filed its case against CryptoFX, September 19, 2022, thereby presumptively halting the solicitation of CryptoFX investors (or, for the Ochoas, their last known solicitation on October 11, 2022) and February 29, 2024, the last day of the month prior to the SEC filing the instant lawsuit, results in prejudgment interest in the following amounts:

| Defendant | Prejudgment Interest |
|---|---|
| Gabriel Arguelles | $5,481.27 |
| Hector Aquino | $5,415.10 |
| Gloria Castaneda | $53,873.92 |
| Carmen De La Cruz | $4,424.14 |
| Dulce Ochoa | $1,534.15 |
| Gabriel Ochoa | $43,856.99 |
| Juan Puac | $16,180.45 |
| Claudia Velazquez | $5,259.64 |

## H. Civil Penalties

85.    The amount of any civil penalty "shall be determined by the court in light of the facts and circumstances."  15 U.S.C. §§ 77t(d), 78u(d)(3).  A first-tier penalty is imposed for any violation of the Securities Act or the Exchange Act.  15 U.S.C. § 77t(d)(2)(A); 15 U.S.C. § 78u(d)(3)(B)(i).  A second-tier penalty is warranted if the defendant's actions "involved fraud, deceit, manipulation, or deliberate or reckless

23

disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii). The Court may impose a third-tier penalty where a defendant's violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C), 78u(d)(3)(B)(iii).

86.    Under both the Securities Act and the Exchange Act, the maximum penalty that can be awarded per violation is the greater of the amount set by statute or the gross amount of pecuniary gain to the defendant as a result of the violation. 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3)(B). The penalty amounts are periodically adjusted for inflation. The inflation-adjusted amounts set by statute for a natural person for the time period at issue are $11,524 for a first-tier penalty, $118,225 for a second-tier penalty, and $236,451 for a third-tier penalty. 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B); s*ee also* 17 C.F.R. 201.1001.

87.    The following factors are relevant in determining whether a civil penalty is appropriate and, if so, in what amount: (1) the egregiousness of the defendant's conduct; (2) the degree of defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *SEC*

*v. Fox*, No. 4:17-CV-271, 2018 WL 1210858, at *3 (E.D. Tex. March 8, 2018); *Offill*, 2012 WL 1138622, at *3.

88.    The SEC has established that Defendants Juan Puac, Gabriel Arguelles, Hector Aquino, Carmen de la Cruz, and Claudia Velazquez engaged in multiple violations of Sections 5(a) and 5(c) of the Securities Act and Section 15(a) of the Exchange Act.  These Defendants are therefore subject to first-tier penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

89.    Balancing the relevant factors, the Court has determined that Defendants Gabriel Arguelles, Hector Aquino, Carmen de la Cruz, Juan Puac, and Claudia Velazquez should pay civil penalties equal to their gross pecuniary gains in the following amounts:

| Defendant | Penalty Amount |
|---|---|
| Gabriel Arguelles | $55,843.00 |
| Hector Aquino | $55,169.00 |
| Carmen De La Cruz | $45,073.00 |
| Juan Puac | $164,846.00 |
| Claudia Velazquez | $53,585.00 |

90.    The SEC has established that the violations committed by Defendants Dulce Ochoa, Gabriel Ochoa, and Gloria Castaneda involved fraud and deceit and resulted in substantial losses to investors.  These Defendants are therefore subject to third-tier penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

91.     Balancing the relevant factors, the Court has determined that Defendants

Gabriel Ochoa and Gloria Castaneda should pay civil penalties equal to their gross

pecuniary gains and that Dulce Ochoa should pay a one-time maximum third-tier civil

penalty in the following amounts:

| Defendant | Penalty Amount |
|---|---|
| Gloria Castaneda | $548,865.90 |
| Dulce Ochoa | $230,464.00 |
| Gabriel Ochoa | $473,401.52 |

92.     The Court will enter by separate docket entries the Final Judgments by

Default against the Defendants.

SO ORDERED this  30th  day of  January     , 2026.

_George C. Hanks Jr_
GEORGE C. HANKS JR.
UNITED STATES DISTRICT JUDGE